THERESA P. O'CONNOR ET AL. *v.*
DOROTHY LAROCQUE
(SC 18648)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued January 11—officially released November 1, 2011

*John H. Parks*, for the appellant (defendant).

*Bruce D. Tyler*, for the appellee (named plaintiff).

*Opinion*

ZARELLA, J. The defendant, Dorothy Larocque, appeals[1] from the judgment of the trial court quieting title to certain real property in favor of the named plaintiff,[2] Theresa P. O'Connor, predicated on a finding that the plaintiff had disseized the defendant of her interest in the property as a tenant in common. The defendant claims that the trial court improperly determined that the plaintiff had overcome the presumption that possession by a tenant in common is not adverse to another cotenant[3] and had proven, by clear and convincing evi-

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] John J. O'Connor was also a plaintiff, but he withdrew from the action and is not a party to this appeal. The trial court found that the named plaintiff, Theresa P. O'Connor, had acquired John J. O'Connor's interest in the property at issue and, therefore, rendered judgment in favor of Theresa P. O'Connor only. In the interest of simplicity, we refer to Theresa P. O'Connor as the plaintiff throughout this opinion.

[3] See Black's Law Dictionary (9th Ed. 2009) p. 1603 (defining "cotenancy" as "[a] tenancy with two or more coowners who have unity of possession" and giving as examples "a joint tenancy and tenancy in common"); see also, e.g., *White* v. *Beckwith*, 62 Conn. 79, 80, 25 A. 400 (1892).

dence, the elements of an adverse possession.[4] The plaintiff responds that the trial court properly concluded that she had overcome the presumption against adverse possession by a tenant in common and had proven its underlying elements. We agree with the defendant and, accordingly, reverse the judgment of the trial court.

The record reveals the following uncontested facts and procedural history. The plaintiff and the defendant are sisters, and they have two other siblings. Their father died intestate in 1971, and, by statute,[5] a vacant lot (lot) that he had solely owned passed as part of his estate, with a one-third interest passing to his widow, the parties' mother, and a one-sixth interest passing to each of his four children. A probate certificate of devise or descent reflecting this division of interest was recorded in the land records of the town of Somers (town) on April 14, 1972. On February 27, 1980, the parties' mother, incorrectly believing that she held full title to the lot, conveyed it to the plaintiff and the plaintiff's husband by quitclaim deed. The deed conveyed "all such right and title" as the mother "ha[d] or ought to have" in the lot, and not full title to the entire lot. As a consequence of this misunderstanding and of the plaintiff's apparent failure to consult the town's land records, the plaintiff incorrectly believed, like her mother, that she had acquired full title to the lot.

---

[4] The defendant also claims that the trial court improperly (1) disregarded its own memorandum of decision on the defendant's motion for summary judgment with respect to her claim seeking equitable relief in reaching a decision on her first claim, and (2) took judicial notice of evidence from prior civil actions involving the parties. Because we conclude that the trial court improperly found that the plaintiff had overcome the presumption against adverse possession by a cotenant, despite its action in taking judicial notice, we need not address those claims.

[5] See General Statutes (Cum. Sup. 1967) § 46-12 (intestate distribution of one-third interest to surviving spouse); General Statutes (Rev. to 1958) § 45-274 (intestate distribution of residue to children).

In 1987, the plaintiff and her mother became aware that there was a "cloud" on the title, that her mother had inherited only a one-third interest in the lot and that the defendant and her siblings each had inherited only a one-sixth interest in the lot. The plaintiff, through her attorney, thus asked the defendant to sign a quit-claim deed relinquishing her one-sixth interest to the plaintiff, which the defendant refused to do. In February and April, 2007, the surviving spouse of one of the siblings and the other sibling, who are not parties to this appeal, conveyed their respective one-sixth interests to the plaintiff by quitclaim deed. As a result, prior to the commencement of this litigation, the plaintiff held a five-sixths interest in the lot, and the defendant held a one-sixth interest.

On October 1, 2007, the plaintiff brought the quiet title action underlying this appeal against the defendant, claiming full ownership of the lot. The first count of the complaint alleged ownership through adverse possession. The plaintiff alleged that she had claimed the subject property as her own, continuously and for more than fifteen years, in an open, visible, hostile, notorious, adverse and exclusive manner, from the time she had acquired her mother's interest on February 27, 1980, to the time she had filed the complaint. In support of her claim, she alleged that she had planted evergreen trees along the perimeter of the lot, paid all of the property taxes, maintained liability insurance, mowed the grass, used the lot for disposing of tree branches and brush from other property and otherwise maintained the property to the exclusion of others. In addition, the plaintiff alleged that her name was listed in the town's assessment records as the owner of the lot but that she held only a five-sixths interest in the lot.

The plaintiff alleged, in the second count of the complaint, ownership by way of an equitable claim. The basis for this claim was that, because the defendant

had prevailed in an earlier adverse possession action against the plaintiff involving nearly identical allegations with respect to an adjoining property, the plaintiff was entitled to prevail on her reciprocal claim in the present action as a matter of fairness. The defendant asserted six special defenses, including that the plaintiff's claim of adverse possession was defeated by the legal presumption against adverse possession that applies when the parties are tenants in common, and a counterclaim seeking partition or sale of the lot.

Thereafter, the defendant filed a motion for summary judgment. The trial court granted summary judgment in the defendant's favor as to the second count of the complaint on the ground that it was "devoid of any allegations resembling any equitable theory of liability." The court added that "no rule in law or equity exists that the victor in an earlier case becomes the vanquished in a later one merely because their roles have reversed."[6]

---

[6] To the extent the dissent refers to the fact that the defendant prevailed in the prior litigation to bolster its contention that the trial court properly ruled in favor of the plaintiff in *this* case; see footnote 2 of the dissenting opinion; its reliance is misplaced for at least four reasons. First, the trial court expressly declined to consider the outcome in the prior litigation when it granted the defendant's motion for summary judgment on the second count of the plaintiff's complaint seeking equitable relief. Second, the trial court explained in its memorandum of decision that it had considered the prior litigation only as evidence of the parties' acrimonious relationship and notice, a point that the plaintiff expressly conceded in her brief to this court. Moreover, the court could not have done otherwise in light of its observation, in granting the summary judgment motion, that the outcome in the prior litigation involving mirror image allegations did *not* mean that the plaintiff was "entitled to prevail on [her] reciprocal claims in the present case as a matter of " 'fairness,' without having to meet the rigors of proving adverse possession." Third, the trial court in the prior litigation did not address the effect of the parties' relationship as cotenants in its adverse possession analysis, and, therefore, the outcome in that litigation is irrelevant in the present context, in which the cotenant relationship has been placed directly in issue. Fourth, because the plaintiff did not appeal from the judgment in the prior litigation, in which she was the losing party, it has no precedential value. Accordingly, insofar as the dissent indirectly relies on the outcome in the prior adverse possession litigation in support of its analysis, such reliance is improper.

The dissent also claims that "the pleadings offered and the positions taken by the present defendant in [the prior litigation] are highly relevant [to this case]"; footnote 2 of the dissenting opinion; because the trial court, in granting the defendant's motion for summary judgment on the plaintiff's equitable claim, stated that "certain aspects of the previous litigation among the parties may have a bearing on the resolution of the present [action], such as by way of collateral estoppel, judicial admissions or evidentiary admissions . . . ." We first note that the plaintiff has made no such claim. Second, the trial court made no reference to the effect of the prior litigation by way of collateral estoppel, judicial admissions or evidentiary admissions on its resolution of the claim in the present action. The court merely explained that the history of acrimonious litigation between the parties was strong evidence from which it could conclude that the plaintiff had given notice to the defendant that she was claiming an exclusive right to the property. The court neither stated nor implied that it had relied on the pleadings and the parties' positions in the prior litigation in reaching its conclusion, even when the defendant asked the court in her motion for articulation to explain how it had utilized the record in the prior litigation when deciding the present action. Accordingly, the dissent's claim that the trial court relied on the pleadings and the parties' positions in the prior litigation to resolve the plaintiff's adverse possession claim has no basis in the record and is, at best, highly speculative.

Furthermore, in citing the defendant's allegations and claims in the prior litigation to discredit her claim in the present case that the plaintiff did not give notice of her intent to occupy the property exclusively, the dissent fails to consider our law on judicial notice. According to an authoritative treatise on Connecticut evidence, "[c]ourt records may be judicially noticed for their existence, content and legal effect. . . .

"Care should be taken [however] to avoid noticing judicial records in one case as evidence upon which to find facts in another case. For example, one can judicially notice that certain testimony was given in a case, but not that it was true.

"Similarly, a judgment in one case cannot be used to establish facts in another case without complying with the hearsay rule." (Citations omitted.) C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 2.3.4 (d), p. 97.

Thus, when a court takes judicial notice of a prior case, it is not all inclusive but is directed to specific records that must be carefully construed in the subsequent litigation. In the present case, the trial court did not take judicial notice of the defendant's allegations and claims in the prior litigation but of the general fact that the parties had been involved in two previous lawsuits. Moreover, although the dissent relies on the allegations in one of those actions to support its conclusion that the defendant had contended that she gave notice to the plaintiff of her exclusive possession of another property in exactly the same manner that the plaintiff contends that she gave notice to the defendant in this action, the trial court made no determination regarding notice in the prior action and did not apply the legal standard employed when the parties are tenants in common. We thus regard the dissent's reliance on the defendant's allegations and claims in the prior action as a distraction that has no relevance in the present case.

The case proceeded to a bench trial on the first count of the complaint and on the defendant's counterclaim. The plaintiff testified at length regarding actions she had taken that allegedly demonstrated her exclusive possession of the lot. She testified that the lot was adjacent to a large piece of land on which her own home was situated, that one third of the lot consisted of woods and that, shortly after she had acquired her mother's interest in 1980, she had planted evergreen trees around the remaining two thirds of the lot, which consisted of a grassy field. In addition, her husband had mowed the grass periodically, and, for many years, she had granted annual requests by the Four Town Fair Association to use the lot for parking during the town fair. Since 1980, the plaintiff also had maintained a liability insurance policy, cleaned up brush and leaves and paid all of the real estate taxes due on the lot.[7] The plaintiff finally testified that she had not communicated with the defendant for twenty-five years, except for her request through an attorney to sign the quitclaim deed in 1987, and that she had not changed the way in which she had used the lot after learning that she lacked sole ownership.

On cross-examination, the plaintiff conceded that an aerial photograph showing that the wooded portion of the lot was adjacent to the road, that the evergreen trees she had planted were behind the woods on the two sides of the lot bordering her other property, and that the fourth side of the lot was separated from a neighboring property by what appeared to be existing trees, "fairly and accurately represented the lot . . . ."

[7] The plaintiff entered exhibits at trial establishing that taxes on the property between 1987 and 2007 were: 1987, $403.28; 1988, $419.74; 1990, $436.20; 1991, $465.82; 1992, $498.74; 1993, $510.26; 1994, $510.26; 1995, $17.05; 1996, $17.34; 1997, $17.75; 1998, $18.27; 1999, $18.88; 2000, $19.65; 2001, $20.46; 2002, $21.27; 2003, $27.53; 2004, $28.85; 2005, $20.45; 2006, $21.22; 2007, $21.78.

The plaintiff further testified that she had planted the evergreen trees "pretty far apart" and that motor vehicles could enter the lot through spaces in between the trees. In addition, the lot was accessible through a larger space between the trees maintained by the plaintiff, as well as through the woods adjacent to the road. The plaintiff admitted that she had never built a fence around the lot or posted "No Trespassing" signs to deter people from entering. Upon being asked, "how did you tell [the defendant] that you were adversely possessing against her," the plaintiff responded: "Through [the] court and lawyers. When . . . the question of the other two lots [involving clouded titles] came up, it was brought up."

Upon completion of the plaintiff's testimony, her husband testified that his Jeep Wrangler and trailer, which together measured approximately seven feet wide by ten feet long, could "easily" be driven onto the lot, as could his full size automobile. The defendant was the last to testify and stated that the plaintiff had never told her that she was claiming exclusive possession of the lot.

During closing arguments, the plaintiff's attorney argued that the defendant had received notice of the plaintiff's claim to the property when the defendant commenced similar litigation against the plaintiff seeking to resolve title to two other lots in which both parties had an interest. He specifically argued: "The [plaintiff] testified that there was a case, and this had come to the attention [of] the parties at the time of [the defendant's] claim to the property involving the various lots, including this lot. And I'm referring to that case for the purpose of pointing out that the defendant certainly had notice. There was correspondence from

attorneys with regard to signing a quitclaim deed.[8] . . .
[T]o say that the defendant didn't know that the plaintiff
was claiming this is somewhat disingenuous, to say
the least."

At the conclusion of the trial, the court rejected the
defendant's special defenses and found that the plaintiff
had overcome the presumption that possession by a
tenant in common is not adverse to another cotenant
and had proven by clear and convincing evidence all
of the requisite elements of adverse possession. The
court also found in favor of the plaintiff on the defen-
dant's counterclaim for partition or sale of the lot before
rendering judgment quieting title in favor of the plaintiff.

Following the trial court's issuance of its memoran-
dum of decision, the defendant filed a motion seeking
an articulation of, inter alia, the basis for the trial court's
findings and conclusion that the record contained clear
and convincing evidence sufficient to overcome the
presumption against adverse possession by a tenant in
common. In replying to multiple questions relating to
this issue, the court repeatedly referred to several pages
in its memorandum of decision discussing (1) the "bitter
relationship between the parties," who had not spoken
in twenty-five years and had been involved in "prior,
acrimonious litigation" concerning a different parcel of
land conveyed to the defendant by their mother, and
(2) the use of the lot as testified to by the plaintiff. The
court also took judicial notice of the two prior cases
involving litigation between the parties.[9] This appeal
followed.

[8] In its articulation, the trial court stated that the plaintiff had prepared
a quitclaim deed immediately prior to the litigation "in an effort to reach a
settlement of the property issues between the parties." Thus, the quitclaim
deed to which the plaintiff's attorney referred was not the quitclaim deed
that the plaintiff had asked the defendant to sign in 1987.

[9] In its memorandum of decision, the trial court noted by way of back-
ground that, although the parties were sisters, there was "nothing sisterly
about their relationship." The court further explained: "They have been
involved in at least two previous lawsuits before this court. In *Larocque* v.

The defendant claims that the trial court improperly concluded that the plaintiff had acquired title to the lot by adverse possession. The defendant specifically challenges the trial court's conclusion that the plaintiff had overcome the presumption that, as a tenant in common, her possession of the lot was not adverse to the defendant. The plaintiff replies that the trial court properly determined that she had satisfied all of the requirements for an adverse possession, including overcoming the presumption against adverse possession by a tenant in common. We agree with the defendant.

We begin with the applicable standard of review. The plaintiff claims that adverse possession should be reviewed as a question of fact under the "clearly erroneous" standard, whereas the defendant argues that the issue constitutes a question of law subject to our plenary review. Neither party is entirely correct. "Adverse possession is frequently said to be a question of fact . . . and such question is ordinarily within the province of the jury to determine. It has been more precisely stated, however, that adverse possession usually is a mixed question of law and fact, depending on the circumstances and conduct of the parties as shown by the evidence."[10] 2 C.J.S. 719, Adverse Possession § 292

*Percoski,* [Superior Court, judicial district of Tolland, Docket No. CV-97-0063927-S (February 18, 2003)], Larocque sued O'Connor both as the executrix of their mother's estate and individually, seeking to quiet title to two parcels of land . . . . Interestingly enough, in that case, Larocque prevailed, successfully proving her title to [those two lots] by adverse possession under a factually similar scenario.

"The second litigation involved a [law]suit brought by Larocque against O'Connor, claiming that O'Connor unduly influenced their mother to disinherit her (Larocque). This court, after [a] trial, [rendered] judgment for O'Connor finding no undue influence. That decision was appealed to the Appellate Court, which affirmed the judgment. *Larocque* v. *O'Connor,* 90 Conn. App. 156 [167, 876 A.2d 1229] (2005)."

[10] Many of our sister states also apply this standard. See, e.g., *Lines* v. *State,* 245 Ga. 390, 396, 264 S.E.2d 891 (1980); *Davis* v. *Mayberry,* 241 P.3d 663, 667 (Okla. App. 2010); *Peeples* v. *Bellingham,* 93 Wn. 2d 766, 771, 613 P.2d 1128 (1980); *Perpignani* v. *Vonasek,* 129 Wis. 2d 478, 490, 386 N.W.2d 59 (App. 1986), rev'd in part on other grounds, 139 Wis. 2d 695, 408 N.W.2d 1 (1987).

(2003). Thus, "[i]t is the province of the jury, or court sitting as a jury, to determine from conflicting or doubtful evidence the existence of facts necessary to constitute adverse possession . . . and that of the court to decide as a matter of law whether the facts found, or which are admitted or undisputed, fulfill the requirements of such possession." Id. "If there is at least some evidence, although slight, which is sufficient to be submitted to the jury, and which tends to show the existence of the essential facts alleged to constitute adverse possession, and such evidence is disputed, or, if undisputed, is of a doubtful character, the question as to the existence of such facts is one of fact for the jury and should be submitted to [it] for determination, under proper instructions from the court; or in case of a trial by the court alone, the question is one of fact for the court sitting as a jury. . . .

"Whether the facts as found by the jury constitute adverse possession is a question of law for the court. The fact of adverse possession also is a question of law for the court and should not be submitted to the jury where the facts with regard thereto are admitted, or the evidence thereof is undisputed and susceptible of but one reasonable inference or conclusion, or where the evidence is insufficient to go to the jury on such question as where there is no evidence in the record upon which the jury could base a finding of adverse possession." Id., § 292, pp. 719–20.

Consistent with this principle, this court repeatedly has recognized that "[i]t is the province of the trial court to find the facts upon which [such a] claim is based. Whether those facts make out a case of adverse possession is a question of law reviewable by this court." *Lucas* v. *Crofoot*, 95 Conn. 619, 623, 112 A. 165 (1921); see also *Wildwood Associates, Ltd.* v. *Esposito*, 211 Conn. 36, 43, 47, 557 A.2d 1241 (1989) (stating that reviewing court may examine whether evidential facts

are legally or logically inconsistent with trial court's conclusion of adverse possession and rejecting plaintiffs' contention that evidence was insufficient as matter of law to support defendants' claim of adverse possession); *Loewenberg* v. *Wallace*, 147 Conn. 689, 699, 166 A.2d 150 (1960) (concluding that mere fact that fence had been in place for more than fifteen years did not, in and of itself, as matter of law, require finding of acquisition of title by adverse possession); *Hagopian* v. *Saad*, 124 Conn. 256, 257, 199 A. 433 (1938) (stating that reviewing court may examine legal conclusions drawn from facts found by trial court in adverse possession action); *Goodwin* v. *Bragaw*, 87 Conn. 31, 39–40, 86 A. 668 (1913) (stating that facts found were "inconsistent with any legal conclusion other than that the defendant had acquired by adverse possession title to the space over that portion of the gangway occupied by [the] structure"); *Layton* v. *Bailey*, 77 Conn. 22, 28, 58 A. 355 (1904) (stating that reviewing court may examine conclusion of adverse possession on basis of evidential facts when some or all of facts found by trial court appear to be legally or logically inconsistent with conclusion). The same principle has been applied in the context of other property takings. See *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 83, 931 A.2d 237 (2007) ("Whether private property has been taken by inverse condemnation is a question of law subject to our plenary review. . . . The trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." [Citation omitted; internal quotation marks omitted.]).

Because a trial court is afforded broad discretion in making its factual findings, those findings will not be disturbed by a reviewing court unless they are "clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly

erroneous when there is no evidence in the record to support it . . . or when *although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed* . . . . A trial court's findings in an adverse possession case, *if supported by sufficient evidence,* are binding on a reviewing court . . . ." (Emphasis added; internal quotation marks omitted.) *Caminis* v. *Troy,* 300 Conn. 297, 306, 12 A.3d 984 (2011). "In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) *Saunders* v. *Firtel,* 293 Conn. 515, 535, 978 A.2d 487 (2009).[11]

[11] The dissent claims that it is not clear whether "the majority considers the conclusion that a particular element of adverse possession such as notice or intent is satisfied in a given case to be a factual finding, subject to deferential appellate review, or, [alternatively], a legal conclusion, subject to de novo review." Footnote 3 of the dissenting opinion. The dissent states that, in its view, reversal is warranted, "even under a deferential standard of review," only if "(1) there is no evidence to support the trial court's factual findings; (2) the evidence is so slight that no reasonable fact finder could find the elements of adverse possession satisfied by clear and convincing evidence; or (3) the [trial court's] factual findings fail to satisfy the established legal standards for adverse possession." Id.

We disagree that this opinion is unclear. As we stated in *Caminis,* a factual finding in an adverse possession case will be deemed by a reviewing court to be clearly erroneous, and thus insufficient as a matter of law, when there is either no evidence in the record to support it or when there is *insufficient* evidence to support it and "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." *Caminis* v. *Troy,* supra, 300 Conn. 306. Accordingly, it would seem that the principal difference between our view and that of the dissent is that the dissent would defer to the trial court's conclusions on the elements of adverse possession even when the court's factual findings are supported by evidence that a reviewing court would consider insufficient under *Caminis.*

With respect to the standard of proof, "[a]dverse possession is not to be made out by inference . . . but by clear and positive proof. . . . [C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Citation omitted; internal quotation marks omitted.) *Wildwood Associates, Ltd.* v. *Esposito*, supra, 211 Conn. 42. Application of the pertinent legal standard to the trial court's factual findings is subject to our plenary review.[12] See *Davis* v. *Margolis*, 107 Conn. 417, 421–22, 140 A. 823 (1928); see also *Bristol* v. *Tilcon Minerals*,

---

[12] To the extent we may have characterized findings of adverse possession in some of our prior cases as questions of fact, we also recognized that such findings must be legally consistent with the facts found. See, e.g., *Wildwood Associates, Ltd.* v. *Esposito*, supra, 211 Conn. 43 ("[a]dverse possession is a question of fact, and when found by the trial court will not be reviewed by this court as a conclusion from evidential facts, unless it appears that these facts, or some of them, are *legally* or logically *necessarily inconsistent* with that conclusion" [emphasis added; internal quotation marks omitted]); *Wadsworth Realty Co.* v. *Sundberg*, 165 Conn. 457, 461, 338 A.2d 470 (1973) ("[t]he conclusions which the court reached must stand unless they are *legally* or logically *inconsistent* with the facts found or unless they involve the application of some erroneous rule of law material to the case" [emphasis added]). As we explained in *Davis* v. *Margolis*, 107 Conn. 417, 140 A. 823 (1928), a conclusion or inference that results from applying a legal standard to the facts found "is often called one of fact; [but] strictly speaking it is one of law and fact, involving, first, the ascertainment of the standard, and then its application to the case in hand." Id., 420–21. The accepted rule is that, when the factual findings are settled, "[a] judgment rendered [on] facts found will not be reversed or set aside unless some erroneous rule of law material to the case has been applied, or unless a conclusion has been reached, or an inference drawn, from a fact, many facts, or the facts found, which affects the judgment rendered in material degree and is legally or logically inconsistent with that or those facts, or is so illogical or unsound, or so violative of the plain rules of reason, as to be unwarranted in law." Id., 422; see also *Winsted Hosiery Co.* v. *New Britain Knitting Co.*, 69 Conn. 565, 575, 38 A. 310 (1897) ("[t]he judgment or ultimate

*Inc.*, supra, 284 Conn. 83 (question of law is subject to plenary review, meaning that "[t]he trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case" [internal quotation marks omitted]).[13] "The

conclusion of a court [on] the special facts in issue, as ascertained from the evidence and settled by the trier, is a conclusion of law, and as such reviewable by this court; and this is true whether such facts are settled by a special verdict of a jury or a special finding of a judge").

Thus, because the dissent repeatedly characterizes the trial court's findings of fact in adverse possession cases as subject to deferential review without acknowledging the reviewing court's role in determining whether such findings are legally insufficient, either because they are inconsistent with an established rule of law or because they are supported by a complete lack of evidence or by insufficient evidence, its analysis is seriously flawed.

[13] The dissent claims that the majority improperly relies on *Bristol* "for the proposition that plenary review of the trial court's factual conclusions is warranted in the present case" because the standard of review articulated in *Bristol*, namely, that a " 'trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case,' " is highly deferential. Footnote 6 of the dissenting opinion. The dissent misunderstands our citation to *Bristol*. As we previously discussed, adverse possession is a mixed question of law and fact. We thus cite *Bristol* for the proposition that the trial court's *legal* conclusions regarding adverse possession are subject to plenary review. To the extent that the dissent also claims that the foregoing language from *Bristol* is by its very nature deferential, we note that reviewing courts have used similar language countless times in describing the plenary standard of review. See, e.g., *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 423–24, 3 A.3d 919 (2010) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record" [internal quotation marks omitted]); *Crews* v. *Crews*, 295 Conn. 153, 161, 989 A.2d 1060 (2010) ("[W]hen an appellant's claim alleges that the facts found by the court were insufficient to support its legal conclusions, we are presented with a mixed question of fact and law to which the plenary standard of review applies. . . . Our task is to determine whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record." [Internal quotation marks omitted.]); *PJM & Associates, LC* v. *Bridgeport*, 292 Conn. 125, 133, 971 A.2d 24 (2009) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record" [internal quotation marks omitted]); *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions

burden of proof is on the party claiming adverse possession." *Caminis* v. *Troy*, supra, 300 Conn. 305.

We next consider the governing legal principles. Despite extensive case law on the subject, the root of adverse possession in our law is statutory.[14] General Statutes § 52-575 (a)[15] establishes a fifteen year statute

are legally and logically correct and find support in the facts that appear in the record" [internal quotation marks omitted]); *Altray Co.* v. *Groppo*, 224 Conn. 426, 431, 619 A.2d 443 (1993) ("[o]ur review of [the] claims is plenary . . . and we will reverse the trial court if its conclusions are legally or logically incorrect or find no support in the facts that appear in the record" [citation omitted]); *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record"); *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 98 Conn. App. 784, 792, 912 A.2d 513 (2006) ("[b]ecause the resolution of [the] claim involves a question of whether the facts found were insufficient to support the court's legal conclusion, this issue presents a mixed question of law and fact to which we apply plenary review"), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007); *Winchester* v. *McCue*, 91 Conn. App. 721, 726, 882 A.2d 143 ("[a]s the plaintiff asserts that the facts found were insufficient to support the court's legal conclusion, this issue presents a mixed question of law and fact to which we apply plenary review"), cert. denied, 276 Conn. 922, 888 A.2d 91 (2005).

[14] Although the scheme of adverse possession in Connecticut, like that of all other states, is based on a statute of repose for actions against an adverse possessor, the mere existence of such statutes does not compel the existence of adverse possession in the form that we know today. To the contrary, "[b]y their terms, most statutes of limitation [including Connecticut's] merely terminate the record owner's access to judicial assistance in recovering possession of his land. The doctrine of adverse possession takes these statutes one conceptual step further by providing that the adverse possessor . . . actually gains legal title, displacing the record owner . . . . This result does not flow ineluctably from the language of the statutes." J. Stake, "The Uneasy Case for Adverse Possession," 89 Geo. L.J. 2419, 2421–22 (2001).

[15] General Statutes § 52-575 (a) provides: "No person shall make entry into any lands or tenements but within fifteen years next after his right or title to the same first descends or accrues or within fifteen years next after such person or persons have been ousted from possession of such land or tenements; and every person, not entering as aforesaid, and his heirs, shall be utterly disabled to make such entry afterwards; and no such entry shall be sufficient, unless within such fifteen-year period, any person or persons claiming ownership of such lands and tenements and the right of entry and possession thereof against any person or persons who are in actual

of repose on an action to oust an adverse possessor. In both form and substance, § 52-575 (a) appears to have remained largely unchanged since its original enactment in 1684. The 1684 statute, in turn, was derived from a 1624 English statute.[16] See General Statutes (1821

possession of such lands or tenements, gives notice in writing to the person or persons in possession of the land or tenements of the intention of the person giving the notice to dispute the right of possession of the person or persons to whom such notice is given and to prevent the other party or parties from acquiring such right, and the notice being served and recorded as provided in sections 47-39 and 47-40 shall be deemed an interruption of the use and possession and shall prevent the acquiring of a right thereto by the continuance of the use and possession for any length of time thereafter, provided an action is commenced thereupon within one year next after the recording of such notice. The limitation herein prescribed shall not begin to run against the right of entry of any owner of a remainder or reversionary interest in real estate, which is in the adverse possession of another, until the expiration of the particular estate preceding such remainder or reversionary estate."

[16] See An Act for Limitation of Actions, and for Avoiding of Suits in Law, 21 Jac. I, c. 16 (1623–24). That statute provided in relevant part: "For quieting of Mens Estates and avoiding of Suits . . . . That all Writts of Formedon in Descender, Formedon in Remainder and Formedon in Reverter, at any tyme hereafter to be sued or brought of or for any Mannors Lands Tenements or Hereditaments whereunto any pson or psons now hath or have any Title, or cause to have or pursue any such Writt, shall be sued and taken within Twentie yeares next after the end of this . . . Session of Parliament; and after the said Twentie yeares expired, no pson or psons, or any of their heires, shall have or mayntayne any such Writt of or for any of the said Mannors Lands Tenements or Hereditaments; and that all Writts of Formedon in Descender Formedon in Remaynder and Formedon in Reverter of any Mannors Lands Tenements or other Hereditaments whatsoevr, at any tyme hereafter to be sued or brought by occasion or meanes of any Title or cause hereafter happening, shalbe sued and taken within Twentie yeares next after the Title and Cause of Accion first descended or fallen, and at no tyme after the said Twentie years: And that no pson or psons that now hath any Right or Title of Entry into any Mannors Lands Tenements or Hereditaments nowe held from him or them, shall thereunto enter but within Twenty yeares next after the end of this . . . Session of Parliament, or within twenty yeares next after any other Title of Entrie accrued; and that no pson or psons shall at any tyme hereafter make any Entrie into any Lands Tenements or Hereditaments, but within Twentie yeares next after his or their Right or Title which shall hereafter first descend or accrue to the same; and in default thereof such psons so not entring, and their Heirs, shalbe utterlie excluded and disabled from such Entrie after to be made; Any former Law or Statute to the contrary notwithstanding."

Rev.) tit. 59, § 1 n.1. Connecticut's adverse possession statute, in both its current and originally enacted forms, reduces the original English limitations period from twenty years to fifteen, slightly modernizes the statutory language and removes one exception from the statute's purview. In all other respects, § 52-575 (a) and its predecessors are remarkably similar to the original English statute.

Over the years, this court has further refined and developed the doctrine of adverse possession. In 1811, we stated that an adverse possession consists of "a possession, not under the legal proprietor, but entered into without his consent, either directly or indirectly given. It is a possession, by which he is disseized and ousted of the lands so possessed. To make a disseisin, it is not necessary, that the disseizor should claim title to the lands taken by him. It is not necessary, that he should deny or disclaim the title of the legal proprietor. No; it is necessary only, that he should enter into, and take the possession of the lands, as if they were his own; to take the rents and profits, and so manage with the property, as the legal proprietor himself would manage with it. If property be so taken, and so used, by any one, though he claims no title, but avows himself to be a wrongdoer, yet, by such act, the legal proprietor is disseized. . . . In truth, to determine, whether or not, the possession be adverse, it is only necessary, to find out, whether it can be considered as the constructive possession of the legal proprietor. . . . If it be without such consent, and against his will, it is adverse." *Bryan* v. *Atwater*, 5 Day (Conn.) 181, 188–89 (1811).

In 1860, we stated more concisely that "the only legitimate inquiry" in a case of adverse possession was whether the party claiming ownership "had the actual, open, adverse occupancy and possession of the controverted property, claiming it as [his] own . . . and actually excluding all other persons from its possession,"

for an uninterrupted period of fifteen years. *Huntington* v. *Whaley*, 29 Conn. 391, 398 (1860). We added that "[a]n adverse possession is not to be made out by inference . . . but by clear and positive proof" and that the doctrine should be strictly applied. Id. In 1866, we further explained what had been implicit in *Huntington*, namely, that evidence of an open, visible and exclusive possession for an uninterrupted period of fifteen years was required to demonstrate that the adverse possession had occurred with the "knowledge and acquiescence of the owner" and, therefore, that the owner had been given a full opportunity to assert his rightful claim. *School District No. 8* v. *Lynch*, 33 Conn. 330, 334 (1866). Present law likewise requires that, "[t]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner. . . . A finding of adverse possession is to be made out by clear and positive proof. . . . The burden of proof is on the party claiming adverse possession." (Internal quotation marks omitted.) *Alexson* v. *Foss*, 276 Conn. 599, 614 n.13, 887 A.2d 872 (2006).

In cases involving claims by one cotenant against another, we have added to this heavy burden by applying a presumption *against* adverse possession. The rationale for this presumption is that, "in view of the undivided interest held by cotenants . . . possession taken by one is ordinarily considered to be the possession by all and not adverse to any cotenant." *Ruick* v. *Twarkins*, 171 Conn. 149, 157, 367 A.2d 1380 (1976); see also *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 191; *Doolittle* v. *Blakesley*, 4 Day (Conn.) 265, 272–73 (1810); 3 Am. Jur. 2d 243–44, Adverse Possession § 201 (2002). In other words, the presumption is based on a

recognition that one cotenant's possession is not necessarily inconsistent with the title of the others. See *Ruick* v. *Twarkins*, supra, 157; see also *Camp* v. *Camp*, 5 Conn. 291, 303 (1824); *Bryan* v. *Atwater*, supra, 191.

Although the presumption may be overcome in certain circumstances, it is not easily done. "[A] cotenant claiming adversely to other cotenants must show actions of such an unequivocal nature and so distinctly hostile to the rights of the other cotenants that the intention to disseize is clear and unmistakable." *Ruick* v. *Twarkins*, supra, 171 Conn. 157. Not only must an *actual intent* to exclude others be demonstrated; id., see also *Lucas* v. *Crofoot*, supra, 95 Conn. 624; *Newell* v. *Woodruff*, 30 Conn. 492, 497 (1862); *Paletsky* v. *Paletsky*, 3 Conn. App. 587, 589, 490 A.2d 545 (1985); *Diamond* v. *Boynton*, 38 Conn. Sup. 616, 619, 458 A.2d 18 (1983); but there also must be proof of "an ouster and exclusive possession so openly and notoriously hostile that the cotenant will have *notice* of the adverse claim." (Emphasis added.) *Ruick* v. *Twarkins*, supra, 158; see also *Hill* v. *Jones*, 118 Conn. 12, 16, 170 A. 154 (1934) ("[o]uster will not be presumed from mere exclusive possession of the common property by one cotenant").

In discussing the type of conduct required to overcome the presumption, we explained in *Newell* v. *Woodruff*, supra, 30 Conn. 492, that acts "consistent with an honest intent to account to his co-tenant for his share of the rents and profits, as the collection of all the rents, payment of all the taxes, occupation and enjoyment of the entire premises and the like, are termed 'equivocal,' because one may possess for all and be willing or compelled to account to all, [whereas] other acts necessarily evince an intent to exclude and hold adversely to his co-tenants, such as refusing to account on the ground that the co-tenant has no right in the property, making explicit claim to the whole and occupying under an avowed or notorious claim of right to the whole . . .

denying the right of the co-tenant to possession, and refusing to acknowledge his right or to let him into possession upon demand made. . . . [T]he difference is only in the kind of evidence by which it may be proved in the two cases. As against a co-tenant it can not be proved merely by acts which are consistent with an honest intent to acknowledge and conform to the rights of the co-tenant, although such acts might be sufficient evidence of an ouster between the parties if there was no tenancy in common and each claimed the whole. Hence it has been deemed eminently proper and safe, before bringing an action of ejectment against a tenant in common, to test the intent with which the property is holden by a formal demand to be let into the enjoyment of the right claimed; and a refusal furnishes that clear evidence of ouster which a demand and refusal furnish of a conversion in trover." Id., 497–98.

Connecticut is not alone in establishing a very high bar to overcoming the presumption. It is generally agreed across jurisdictions that, because a relationship of trust between cotenants is presumed whereby one tenant in common holds the property for the benefit of the others, "there must be some hostile act, conduct, or declaration on the part of the possessor amounting to a *repudiation* of [the] cotenants' rights and an *assertion* of exclusive title in the possessor, of which the cotenants have knowledge or notice."[17] (Emphasis

---

[17] The dissent states that "the majority . . . appears to believe that there can be adequate notice of a cotenant's intent to dispossess only when there is either an express notification or something closely akin to it, [but] a thorough review of the cases reveals that there is no such requirement." Text accompanying footnote 8 of the dissenting opinion. We reject this reading of our opinion. This court has never stated, nor do we suggest, that notice necessarily must be express, or closely akin to express. To the contrary, although the court in *Newell* observed that actual, or express, notice by way of refusing to allow a cotenant entry on the property in response to a formal demand would furnish clear evidence of ouster, it also stated that notice may be demonstrated by "any acts which show an actual intent to exclude the co-tenant permanently from his rights." *Newell* v. *Woodruff*, supra, 30 Conn. 497. Our case law thus has determined that actual

added.) 3 Am. Jur. 2d 245, supra, § 202. The mere unannounced intention or exclusive possession of one cotenant is not sufficient to support a claim of adverse possession in cases involving tenants in common. See id., §§ 203 and 204, pp. 245–47.

Other jurisdictions also have recognized, as we did in *Newell*, that, "[w]here one cotenant occupies the common property notoriously as the sole owner, using it exclusively, improving it, and taking to such cotenant's own use the rents and profits, or otherwise exercising over it such acts of ownership as manifest *unequivocally* an intention to ignore and repudiate any right in other cotenants, such occupation or acts and claim of sole ownership will amount to a disseisin of the other cotenants, and the possession will be regarded as adverse from the time they have knowledge of such acts or occupation and of the claim of exclusive ownership. However, leasing out the use and possession of the entire premises is not in itself an ouster or disseisin of cotenants nor is it sufficient to establish an adverse possession against them. Whatever significance attaches to the making of improvements on the land depends on their nature and extent and on the particular situation presented, and the making of improvements does not in ordinary circumstances provide a decisive indication of possession adverse to other cotenants. Although payment of real estate taxes by the cotenant in possession may not be a prerequisite to acquiring title by adverse possession, it is proper to consider payment of taxes as a factor in determining whether a claim of ownership exists or a claim is knowingly

---

notice is not the only, or even the preferred or most often used, method by which one cotenant in possession of the property may convey an intent to dispossess the other, and we have said nothing in this opinion to cast doubt on the continued viability of that principle. We add that, to the extent the dissent distinguishes between the adverse possessor's "giving notice" and the ousted party's "hav[ing] notice"; footnote 8 of the dissenting opinion; it is a distinction without a difference.

adverse, but the fact of payment of taxes may be inadequate or not given much weight." (Emphasis added.) Id., § 209, p. 252; see also id., nn. 1 through 5 (surveying law of other jurisdictions).

Mindful of these principles, this court has considered claims of adverse possession by one cotenant against another on only a few occasions.[18] In *Lucas* v. *Crofoot*, supra, 95 Conn. 621, 623–27, we upheld a ruling of adverse possession in favor of a plaintiff who had held partial title to an island for twenty-one years. We first observed that, "[b]ecause of gaps in the record . . . the full legality of the plaintiff's title [could] only be made out by proof of all the elements of an adverse possession . . . ." Id., 623. We then explained that "[t]he first and vital step [in establishing such a claim] must be the proof of an entry upon the premises and an ouster of the other cotenants"; id.; and that "ouster" meant "a possession attended with such circumstances as to evince a claim of exclusive right and title, and a denial of the right of the other tenants to participate in the profits." (Internal quotation marks omitted.) Id. 624. We ultimately concluded that "the effect" of the quitclaim deed from the plaintiff's predecessor tenant in common "purporting to convey the whole title" to the plaintiff was "to assert his own title and to deny the title of the other cotenants. . . . When the grantees recorded this deed and entered and took possession thereunder, their possession [was] presumed to have been under the deed itself and not under the title of the cotenants. They entered under a claim and color of right, and this is equivalent to an ouster of the other cotenants, as to whom they thence held adversely. It showed an actual intent to exclude the cotenant perma-

---

[18] We note that, in well over 200 years, approximately nine cases have been decided by this court, which demonstrates the strength of the presumption against adverse possession, and that, of those nine cases, only five have been decided in favor of the claimant.

nently from his rights."[19] (Citation omitted; internal quotation marks omitted.) Id. We further concluded that

[19] The dissent relies on *Lucas,* among other sources, in claiming that "a cotenant is placed on constructive notice when she is aware that the adverse possessor takes common land from the outset under an exclusive claim of right, rather than as an avowed cotenant" and that, "[i]n those situations, the majority rule is that 'in the case of an entry hostile in its inception much less evidence is needed to establish that the possession is legally adverse to the possessor's cotenants . . . .'" Aside from the fact that constructive notice of this kind is irrelevant in the present case, given the plaintiff's concession that she did not know that she was a tenant in common until 1987 and did not notify the defendant of her intent to occupy the lot exclusively until 1997 through the court and her attorneys, we deem *Lucas* and the quoted law clearly inapplicable in this factual context for another reason. Although the court in *Lucas* determined that a cotenant's quitclaim deed purporting to convey full title was tantamount to notice, such that the grantees held the land adversely to the other cotenants; see *Lucas* v. *Crofoot,* supra, 95 Conn. 624–25; the dissent well knows that the quitclaim deed to the plaintiff from her mother in the present case did *not* purport to convey the entire lot but only such interest as her mother held, which was a partial interest described in a certificate of devise or descent from her father's estate that *previously had been recorded in the land records.* Moreover, both the plaintiff and the trial court expressly acknowledged that the quitclaim deed did not convey full title to the plaintiff. In contrast, title to the property in *Lucas* was recorded in the adverse possessor's name alone. See id., 621–24. In that case, the court observed that one of several predecessors in title who had been a cotenant explicitly stated in deeding his portion of the property to his successor in title that "all of the other [co]tenants had conveyed [their interests] to him," and that the deed to the other portion of the property "expressly warranted the title to that portion of the island against the claims of all other persons." Id., 625. Accordingly, any legal principle or Connecticut case regarding the effect of a quitclaim deed purporting to convey the entire interest in property to the cotenant in possession is inapposite in the present circumstances, and the dissent's insistence that "*Lucas* . . . established the broader proposition that taking under color of *any* quitclaim deed can provide at least some indication of the grantee's intent to hold the property exclusively" is misplaced. (Emphasis added.) Footnote 14 of the dissenting opinion. Indeed, the court in *Lucas* expressly rejected this exact argument when it stated: "The defendants urge that the deeds under which the north part of the island was conveyed were quitclaim deeds, and that a quitclaim of all the grantor's 'right, title and interest' is not inconsistent with the existence of an interest in cotenants, and does not deny that interest. This distinction between the effect of a warranty and a quitclaim deed generally, is doubtless valid; but a deed which, though in form a quitclaim, contains in express terms a disclaimer and disavowal of any interest in cotenants or others, is of as much value as a warranty deed could be in giving notice of the adversary character of the entry and possession thereunder." *Lucas* v. *Crofoot,* supra, 624–25.

the adverse possession had been "continuous and exclusive, open and notorious," for more than twenty years, although "much less actual use of [the] island [was] necessary to establish [a] claim of ownership than would have been [required in] the case of a tillable farm . . . ." Id., 626.

Similarly, in *Ruick* v. *Twarkins*, supra, 171 Conn. 149, we concluded that a cotenant had established entry on the premises and ouster sufficient to prevail on a claim of adverse possession because she had obtained a pro-

---

The dissent, while recognizing the distinction between the present case and *Lucas*, states that "the relevant question [in this case] is whether a conventional quitclaim deed, which is nevertheless believed by all parties to convey full title to the property, provides any evidence to support the trial court's finding that the plaintiff intended to hold the land exclusively . . . ." The dissent specifically claims that "[a]t the very least, as we explained in *Lucas*, holding under color of title of a quitclaim deed places an affirmative duty on cotenants out of possession to make a 'hostile move in support of their own title . . . .'" The dissent's framing of the question, however, disregards an essential legal fact of significance in this case, namely, that a certificate of devise or descent (certificate) reflecting the respective interests of various family members in the lot had been recorded on the land records. This court cannot follow an approach that disregards essential legal facts. Although the mother's deed to the plaintiff resembled a conventional quitclaim deed, it had to be considered in light of the certificate, which preceded the deed on the land records and could have been discovered quite easily. The dissent also misapplies *Lucas* because that case did not involve a conventional quitclaim deed, but, rather, an *unconventional* quitclaim deed that expressly conferred full title to the property on the adverse possessor. It is for this reason, and not because the deed was a quitclaim deed in form, that the court in *Lucas* concluded that the lack of any "hostile move [by the nonpossessing cotenants] in support of their own title" permitted the trial court properly to conclude that the requirements of adverse possession had been satisfied. *Lucas* v. *Crofoot*, supra, 95 Conn. 626. Accordingly, the dissent's analysis is inapplicable in this context because the court in *Lucas* premised its conclusion on its understanding that the deed was, in effect, a warranty deed. In any event, the dissent's analysis under *Lucas* regarding the quitclaim deed and the plaintiff's belief that she intended to hold the lot exclusively from the time she took possession in 1980, and the cases from other jurisdictions concerning conventional quitclaim deeds on which the dissent relies, are irrelevant in the present context because this court must follow *Newell* in concluding that the plaintiff could not have given notice before 1987, when the parties first learned that they were tenants in common. See footnote 22 of this opinion and accompanying text.

bate decree declaring her to be the sole owner of the contested property, the decree had been registered on the land records and she had continued to occupy and improve the property for more than thirty years. See id., 154, 158. Consequently, we found initial ouster by a tenant in common in both *Lucas* and *Ruick* when title to the property had been recorded in her name. See id., 158; *Lucas* v. *Crofoot*, supra, 95 Conn. 624; see also *Hagopian* v. *Saad*, supra, 124 Conn. 257–59 (concluding that plaintiff had acquired land by adverse possession on basis of agreement executed by tenants in common, and recorded in same manner as deed, dividing property and granting disputed property to plaintiff, who had occupied property for more than fifteen years). This is consistent with our discussion in *Newell*, although we do not suggest that registration of title in the land records in the adverse possessor's name alone is the *only* way to demonstrate ouster when the parties are tenants in common.

For example, we concluded in *Camp* v. *Camp*, supra, 5 Conn. 291, that the trial court improperly failed to instruct the jury that it was authorized to presume an ouster of the plaintiff on the ground that, for a period of *fifty-seven years*, the defendants, members of an ecclesiastical society, had claimed the property as the society's own, had used it as a parsonage and had had sole and undisturbed possession of the property without the payment of rent and without any claim being made by the plaintiff for the land or the profits derived therefrom. Id., 298, 302. In reaching that conclusion, we relied on *Doe ex dem. Fishar* v. *Prosser*, 98 Eng. Rep. 1052 (K.B. 1774) (*Doe*), deemed "a leading case" on the subject, in which the Court of King's Bench in England had determined that "*thirty-six years'* sole and uninterrupted possession, by one tenant in common, without any account to, or demand made, or claim set up, by his companion, [was] a sufficient ground for

a jury to presume an actual ouster of the co-tenant."
(Emphasis added.) *Camp* v. *Camp*, supra, 302–303. In
*Doe*, Lord Mansfield, the Chief Justice, first acknowl-
edged that, generally, "[i]n the case of tenants in com-
mon . . . the possession of one tenant in common,
eo nomine, as tenant in common, can never bar his
companion . . . because such possession is not
adverse to the right of his companion, but in support
of their common title . . . and by paying him his share,
he acknowledges him co-tenant. Nor indeed is a refusal
to pay of itself sufficient, without denying his title. But
if upon demand by the co-tenant of his moiety, the other
denies to pay, and denies his title, saying he claims the
whole and will not pay, and continues in possession
. . . such possession is adverse and ouster enough."
*Doe ex dem. Fishar* v. *Prosser*, supra, 1053. Lord Mans-
field then determined that, even though there appeared
to be no evidence in that case that the plaintiff had
sought ejectment of the adverse possessor or had made
such demands, the jury had been "warranted by the
length of time . . . to presume an adverse possession
and ouster . . . ." Id. Joined by Justices Aston, Willes
and Ashhurst, who expressed similar views in individual
opinions, Lord Mansfield explained that an "undis-
turbed and quiet possession" of nearly forty years,
which was "more than quadruple the time [allowed
under the then existing] statute for tenants in common
to bring their action of account," was a "sufficient
ground for the jury to presume an actual ouster . . . ."
Id.; see also id., 1053–54 (separate opinions of Aston,
Willes and Ashhurst, Js.); see also *Bryan* v. *Atwater*,
supra, 5 Day (Conn.) 188 ("if one tenant in common
. . . has been in possession a great number of years,
without any accounting to his fellow commoners, this
is proper evidence . . . from which the jury may infer
an adverse possession"). *Camp* thus stands for the
proposition that the passage of time, if sufficiently

lengthy, may provide the basis for a claim of ouster and adverse possession by a tenant in common who occupies the property for a specific and obvious use, such as a parsonage.[20] See *Camp* v. *Camp*, supra, 298, 302.

---

[20] The dissent relies on *Doe* and *Camp* for the proposition that there is no "minimum time frame" beyond the statutory period that a cotenant is required to occupy the property exclusively, without more, to establish ouster and adverse possession. Text accompanying footnote 27 of the dissenting opinion. We reject this broadly worded principle. *Doe* is not a Connecticut case, and it involved a tenant in common who had occupied the property for a period of approximately forty years, almost *quadruple* the time required to establish ouster under the governing English statute. See *Doe ex dem. Fishar* v. *Prosser*, supra, 98 Eng. Rep. 1053. Moreover, although the court in *Camp* relied on *Doe* with respect to the element of time, it considered the length of time *together with* the use of the property as a parsonage in finding for the adverse possessor. See *Camp* v. *Camp*, supra, 5 Conn. 298, 302. Accordingly, although we agree with the dissent that this court never has established a "minimum time frame beyond the statutory requirement for adverse possession"; text accompanying footnote 27 of the dissenting opinion; we do not agree that *Camp* necessarily can be construed to mean that a lengthy possession, without more, is sufficient to prove ouster and adverse possession.

We also do not agree with the dissent that such a rule was adopted in *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 181. In that case, the court, citing *Doe*, merely noted in passing that, "if one tenant in common . . . has been in possession a great number of years, without any accounting to his fellow commoners, this is proper evidence . . . from which the jury may infer an adverse possession." Id., 188. The court did not apply that principle to the facts of that case, in which the property occupied by the adverse possessor consisted of one acre of land together with a house, a barn, a store and other buildings from which he had derived rents and profits. Id., 182–83 (rendition of facts). Moreover, the court's passing reference to adverse possession for "a great number of years"; id., 188; cannot be regarded in the same category as the holding in *Camp*, in which we concluded, under the facts of that case, that adverse possession had been proven because the property had been occupied for a lengthy period of time and used as a parsonage. See *Camp* v. *Camp*, supra, 5 Conn. 298, 302. We therefore disagree with the dissent's claim that the majority has conceded that lengthy acquiescence, without more, is an accepted part of Connecticut law on adverse possession, although we remain open to the possibility that, in some future case, we might reach that conclusion under appropriate facts.

Finally, even if this court had adopted the rule articulated in *Doe*, the rule would not have been applicable to this case because the plaintiff in the present case did not give notice to the defendant until 1997. Thus, to

In the present case, the trial court noted that the parties had submitted a stipulation of facts describing the conveyance of the lot following their father's death.[21] The court also made several additional factual findings in concluding that the plaintiff had overcome the presumption and had met her burden of proving adverse possession by a tenant in common. These findings included that (1) the plaintiff had asserted her intent to disseize the defendant and to maintain exclusive right and title to the lot from February 27, 1980, when she had acquired her mother's interest, (2) the defendant was on notice of the plaintiff's claim of exclusive right to the lot because of the parties' "bitter relationship," as reflected in their history of "prior acrimonious litigation" and lack of communication for twenty-five years, and (3) the plaintiff had satisfied the other elements of an adverse possession because, since 1980, she had paid all taxes on the lot, maintained it together with her husband, planted trees around its perimeter and given the town permission to use it for parking during the annual town fair. In rejecting the defendant's special defenses, the court further found

the extent her possession may have been adverse from that time forward, it did not meet the statutory requirement, much less the requirement established in *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 188, that the possession be maintained for "a great number of years . . . ."

[21] The parties stipulated that (1) "The plaintiff . . . has an ownership interest in a piece or parcel of land situated in the town of Somers shown and designated as Lot #54 on a map or plan of lots entitled: 'PROPERTY OF C.A. PERCOSKI WEST SIDE OF FIELD ROAD' . . . hereinafter referred to as '343 Billings Road,'" (2) "[t]he plaintiff and her husband acquired an interest in 343 Billings Road from the plaintiff's mother, Doris Percoski, pursuant to a quitclaim deed dated February 27, 1980, which was recorded in the land records of the town [of] Somers . . . on February 28, 1980," (3) "Doris Percoski acquired her interest in the property from her late husband, Constanty Percoski, who was the sole owner of the property when he died intestate in 1971," (4) "[b]y statute, a one-third interest in the subject property passed to Constanty Percoski's widow, Doris Percoski, at the time of his demise in 1971," and (5) "[b]y statute, a one-sixth interest in the subject property passed to each of Constanty Percoski's four children: [the plaintiff, the defendant] Timothy Percoski and Richard Percoski."

that there was no evidence that the plaintiff had used the lot with the defendant's permission and that there had been no occasion for the plaintiff to take any action to exclude the defendant from the lot because the defendant herself had given no indication that she claimed an ownership interest. In addition, the court found that the defendant had not believed or claimed that she had such an interest until 1987, when the family discovered a cloud on the title.

We first conclude that the trial court's finding that the plaintiff had asserted her intent to disseize the defendant and to maintain exclusive right and title to the lot from February 27, 1980, to the present was clearly erroneous because there was no evidence in the record to support it. See *Caminis* v. *Troy*, supra, 300 Conn. 306. As we stated in *Newell* when discussing the issue of intent, "actual intent implies actual knowledge, and there can be no wrongful dispossession or wrongful exclusion, no adverse intent and adverse holding, where one is in the enjoyment of that which he honestly supposes is his, and has no knowledge that any other person has, or claims to have, a right to participate in the possession of it. A person who has received by inheritance from his father an estate, and is in the enjoyment of it, is in one sense holding adversely to all the world; but not in the sense in which the term is used in the law of disseisin. He had done and is doing no wrongful act. He has not dispossessed any one, and is not wrongfully excluding any one of whose right or claim he has any knowledge. He is not guilty of any wrongful intent. . . . He is honestly in the enjoyment of an apparent clear right; he knows of no other right to which he should yield, and is conscious of no duty unperformed."[22] *Newell* v. *Woodruff*, supra, 30 Conn.

[22] The dissent claims that adverse possession was not an issue in *Newell* and that the legal principles articulated in that case apply only in the context of an ejectment action because it would be unjust to find a cotenant liable for damages resulting from an alleged ouster without a mens rea requirement, and there is no indication in *Newell* that the court would have applied the

same standard in an action seeking to quiet title. See footnote 17 of the dissenting opinion. We disagree for numerous reasons. First, the passage in *Newell* containing the language on intent immediately follows, and is part of, the court's discussion of the general legal principles that apply in adverse possession actions involving cotenants. See *Newell* v. *Woodruff*, supra, 30 Conn. 497–98. Second, although not authoritative, the syllabus in *Newell* states, in its very first paragraph, that "[a]n actual intent to exclude the co-tenant from the enjoyment of the property must be shown, and no evidence on this point is so satisfactory as a refusal to admit him to possession, or to account for profits received, on a demand made"; id., 492 (syllabus); thus clearly implying knowledge of the cotenancy by the party in possession. Third, the dissent appears to misunderstand that a party bringing an action for ejectment must allege wrongful dispossession of his property by the other party in much the same manner that a plaintiff seeking to quiet title in an adverse possession action must allege wrongful dispossession of the defendant's interest in the property. See, e.g., *Simmons* v. *Parizek*, 158 Conn. 304, 305, 259 A.2d 642 (1969); see also *Potter* v. *New Haven*, 35 Conn. 520, 522 (1869) (there is no right of action in ejectment unless defendant is disseizor when action is brought). Indeed, there is such a close connection between proof of wrongful possession, other than the statutory time frame, in actions of ejectment and actions to quiet title that adverse possession has been raised as a defense in actions of ejectment. See, e.g., *Kiley* v. *Doran*, 105 Conn. 218, 225, 134 A. 792 (1926) (defendant raised defense of adverse possession in action of ejectment in which plaintiff claimed that he had been wrongfully dispossessed of property). Fourth, although the court in *Newell* did not state that the same principle concerning knowledge applies in actions to quiet title, it also did not state that the principle applies *only* in ejectment actions. Fifth, the rationale for applying the principle in other actions, namely, that cotenants have an equal right to possess the property and, therefore, that the standard for finding notice and intent must be higher in such cases to protect the rights of the cotenants, is more persuasive than the rationale pertaining to damages cited by the dissent. Sixth, in the only case since *Newell* that appears to have applied this principle, *Diamond* v. *Boynton*, supra, 38 Conn. Sup. 619, the Appellate Session of the Superior Court concluded, in an action alleging breach of the covenants contained in certain warranty deeds, that the defendants lacked the requisite intent to possess adversely against the plaintiff because the defendants, who were spouses, admitted that they thought they owned the entire property. The court specifically quoted from *Newell* that "[a]ctual intent implies actual knowledge, and there can be no wrongful dispossession or wrongful exclusion, no adverse intent and adverse holding, [when] one is in the enjoyment of that which he honestly supposes is his, and has no knowledge that any other person has, or claims to have, a right to participate in the possession of it." (Internal quotation marks omitted.) Id., 619, quoting *Newell* v. *Woodruff*, supra, 498. We therefore disagree with the dissent that this principle is inapplicable in the present context.

The dissent further argues that knowledge of the cotenancy is not required because, in four cases subsequent to *Newell*, this court repeatedly upheld findings of adverse possession among cotenants without such knowledge.

See footnote 18 of the dissenting opinion. In three of those cases, however, the names of the parties in exclusive possession were the only names listed in the public records as the property owners during the time of possession, and the court in each case determined that that fact was conclusive in resolving the dispute. See *Ruick* v. *Twarkins*, supra, 171 Conn. 155, 157–58 (recording of probate decree provided notice of possessor's intent to disseize); *Hagopian* v. *Saad*, supra, 124 Conn. 257 (ownership interest was set forth in "article[s] of agreement . . . recorded like a deed of land" [internal quotation marks omitted]); *Harrison* v. *International Silver Co.*, 78 Conn. 417, 419, 62 A. 342 (1905) (recitation of facts) (possessor and predecessors in title had actual, exclusive, and uninterrupted possession and use of land for more than twenty-six years prior to action under warranty deed and based on claim of title in fee simple). In the fourth case, the court did not decide whether there had been an ouster and ordered a new trial. See *Standard Co.* v. *Young*, 90 Conn. 133, 139, 96 A. 932 (1916). Accordingly, the three cases that actually were decided involved special circumstances in which the recording of the possessors' names in the public records was an essential consideration, and they cannot be compared with *Newell*, in which the court did not consider whether those circumstances existed.

Even without this compelling distinction, the dissent's citation to the foregoing cases for the proposition that Connecticut law permits adverse possession among cotenants without knowledge of the cotenancy is unpersuasive. In *Ruick*, for example, the court concluded that the plaintiff adverse possessor and her husband had purchased the property as tenants in common, that the plaintiff's application for a probate decree declaring her to be sole owner of the property, which commenced the period of exclusive possession, "was clearly for the purpose and with the intent of eliminating [the husband's] interest in the land"; (internal quotation marks omitted) *Ruick* v. *Twarkins*, supra, 171 Conn. 158–59; and that the plaintiff's ouster of her husband "was clearly and unmistakably demonstrated by the recording of the certificate of distribution, her assumption of exclusive possession of the property, her remarriage, and the construction of a new house on the land." Id., 158. The principal holding in *Ruick* thus was based on a recognition that the plaintiff had knowledge that she was dispossessing her husband when she assumed exclusive possession of the property. The court further held that the plaintiff's adverse possession, which had begun against her then living husband, "continued against his other heirs, their daughters"; id., 160; and that, because the plaintiff's title by adverse possession was complete long before the children asserted any right to an interest in the property, they were barred from entry. Id., 160–61. Accordingly, *Ruick* merely held, with respect to the children, that, because they had failed to assert their rights in a timely manner, the plaintiff had acquired title by adverse possession. The court made no finding as to the effect of the children's ignorance on the ultimate disposition of that case.

The dissent also mistakenly relies on *Harrison*. In that case, the issue before the court was whether the plaintiffs, who were claiming to own the land as tenants in common with the defendant, had lost the right to bring an action for partition of the property by sale because of the defendant's exclusive possession of the property for many years; see *Harrison* v. *Inter-*

498; see also *Diamond* v. *Boynton*, supra, 38 Conn. Sup. 619 (concluding that, because defendant spouses believed that they owned entire property, they could not satisfy element of intent required for adverse possession of co-owner's interest).[23]

In the present case, the plaintiff conceded in her testimony at trial that she believed that she had acquired

*national Silver Co.*, supra, 78 Conn. 417, 419 (rendition of facts); and the court did not consider, or reach any conclusion regarding, the defendant's knowledge as to its ownership of the property when the ouster commenced. See id., 419–22. Finally, although the dissent relies on language in *Hagopian* that "[a] wrongful intent to disseize the true owner is not a necessary element of adverse possession"; *Hagopian* v. *Saad*, supra, 124 Conn. 259; we regard that case as an outlier and do not follow it for the reasons set forth in footnote 23 of this opinion.

A final problem with the dissent's reliance on the foregoing cases is that none addresses the question, as the court did in *Newell*, of whether a cotenant without knowledge of the cotenancy may dispossess the other cotenant or cotenants. The dissent simply draws its own legal conclusions on the basis of the facts presented. Accordingly, we disagree with the dissent that adverse possession is not barred in cases in which the tenant in possession lacks knowledge of the cotenancy because no reviewing court has disavowed the principle articulated in *Newell* in the nearly 150 years since that case was decided, and one reviewing court has applied it.

[23] A person's mistaken belief that he or she is the lawful owner is immaterial in an action seeking title by adverse possession when the parties are *not* cotenants, as long as the other elements of an adverse possession have been established. See, e.g., *Loewenberg* v. *Wallace*, 151 Conn. 355, 357–58, 197 A.2d 634 (1964); *Ahern* v. *Travelers Ins. Co.*, 108 Conn. 1, 5, 142 A. 400 (1928); *Searles* v. *DeLadson*, 81 Conn. 133, 135–36, 70 A. 589 (1908); *Paletsky* v. *Paletsky*, supra, 3 Conn. App. 588. This is because, unlike tenants in common, an adverse possessor in such a case has no legal right to possess the property, and, therefore, the possession itself is sufficient to claim title. In contrast, tenants in common have an equal right to possess the property. Thus, as we previously explained, a tenant in common who wishes to claim property by adverse possession must give the other cotenant clear and unmistakable notice of an intent to do so. The only Connecticut case stating otherwise is *Hagopian* v. *Saad*, supra, 124 Conn. 259, which relied on *Searles* v. *DeLadson*, supra, 136, in asserting that "[a] wrongful intent to disseize the true owner is not a necessary element of adverse possession." The *Hagopian* court's reliance on *Searles*, however, was improper, because the parties in *Searles* were not tenants in common, and the court in *Searles* was not discussing adverse possession in that context. Moreover, to our knowledge, no other appellate case involving cotenants has followed *Hagopian*'s statement of the law on that issue. Accordingly, we regard *Hagopian* as an outlier.

full title to the lot in 1980 and did not know that she had not acquired full title until 1987. Accordingly, we conclude, as a matter of law, that the plaintiff could not have had the requisite intent to wrongfully exclude the defendant from the lot before 1987 because she believed until that time that she was its sole and exclusive owner.[24]

There also is no evidence in the record that the plaintiff had the requisite intent to dispossess the defendant in 1987 when she learned that she was not the sole owner of the lot. The only evidence in the record regarding either party's intent in 1987 was of the *defendant's* intent, which consisted of undisputed evidence that the defendant had refused to relinquish her ownership interest in the property when the plaintiff asked her to sign the quitclaim deed, a fact that the trial court recognized when it noted in its memorandum of decision that "the defendant . . . gave no indication that she claimed an ownership interest . . . *until 1987*, when the family discovered there was a cloud on the title." (Emphasis added.) There is no countervailing evidence in the record of the plaintiff's intent to dispossess the defendant after receiving notice of the defendant's intent to retain ownership of the property.[25] The

[24] We thus disagree with the dissent, which rejects *Newell* out of hand and contends that the plaintiff's mistaken belief that she was the sole owner of the lot has no effect on the analysis other than to lower her burden of proving intent and notice and to require "the defendant to indicate that she no longer intended to abide by the status quo" after the parties discovered in 1987 that there was a cloud on the title.

[25] The dissent's contention that the defendant's unwillingness to sign the quitclaim deed supports, rather than undermines, the plaintiff's claim is inexplicable. As we indicated in the preceding discussion, there is no evidence in the record that the plaintiff informed the defendant in 1987 that she intended to dispossess the defendant if the defendant refused to sign the quitclaim deed. The only evidence in the record as to the parties' intentions in 1987 is that the defendant refused to sign the quitclaim deed, thus indicating that the plaintiff was aware of the defendant's ownership interest in the property and of the defendant's intent to retain it.

only evidence of the plaintiff's intent in 1987 or at any other time thereafter is the evidence of conduct consistent with her right to possess the property as a tenant in common with the defendant. We therefore conclude that the trial court's finding on intent is clearly erroneous because it is unsupported by the evidence.

We also view as clearly erroneous the trial court's finding that the "bitter relationship between the parties," as reflected in their history of "prior acrimonious litigation" relating to a similar property, and their lack of communication for twenty-five years was proof of the plaintiff's notice to the defendant of her intent to claim exclusive possession sufficient to establish adverse possession by a tenant in common. The court specifically found that "the history between these litigants is strong evidence from which the court can readily infer that [the plaintiff] was claiming an exclusive right to the property and that, clearly, [the defendant] was under no illusion otherwise." We conclude, however, that the evidence on which the court relied was insufficient to support this finding. See *Caminis* v. *Troy*, supra, 300 Conn. 306.

The plaintiff conceded in her testimony that she did not give notice of her intent to claim an exclusive right to the lot until the defendant had initiated litigation to acquire full title to two other lots conveyed to the parties by their mother, a fact that the plaintiff's attorney emphasized during his closing argument when he stated that he had referred to the prior litigation initiated by the defendant "for the purpose of pointing out that the defendant certainly had notice."[26] Accordingly, even if

[26] We note that, although the trial court found that the lot was conveyed to the plaintiff by her mother in 1980 and that all of her children, including the plaintiff and the defendant, believed that their mother was the sole owner of the lot, that finding does not amount to a finding that the defendant was aware of the conveyance to the plaintiff. Thus, there are no factual findings of notice in 1980, when their mother conveyed her interest in the lot to the plaintiff.

we assume that the trial court's reference to the prior litigation as evidence of the parties' "bitter relationship" was permissible; cf. *Jewett* v. *Jewett*, 265 Conn. 669, 678 n.7, 830 A.2d 193 (2003) ("[t]here is no question that the trial court may take judicial notice of the file in another case" [internal quotation marks omitted]); the acrimony arising from the prior litigation could *not* have provided sufficient notice to the defendant because the record reveals that the complaint in the first action, *Larocque* v. *Percoski*, Superior Court, judicial district of Tolland, Docket No. CV-97-0063927-S (February 18, 2003), which involved the dispute concerning the two other lots, was not filed until 1997, and the complaint in the second action; see *Larocque* v. *O'Connor*, 90 Conn. App. 156, 876 A.2d 1229 (2005); which involved the probate dispute, was not filed until 2002. We therefore conclude that the trial court's finding that the plaintiff gave the defendant notice of her intent to possess the lot by way of the "prior acrimonious litigation" was clearly erroneous because the first action was commenced approximately ten years, and the second action approximately five years, before the filing of the present complaint, thus falling short of the fifteen year statutory requirement. See General Statutes § 52-575 (a).

Furthermore, there is no evidence in the record that the plaintiff's possession and use of the lot was so openly and notoriously hostile that the defendant had notice of her adverse possession claim because of that conduct alone. The trial court found that the plaintiff's adverse use of the lot consisted of her payment of property taxes, maintenance activities such as mowing and cleanup, the planting of trees around the perimeter of the lot and her granting the town permission to use the lot for parking during the annual town fair. All of these activities, however, were entirely consistent with the actions of a tenant in common who shares an inter-

est in the property *without* an intent to dispossess. See *Newell* v. *Woodruff*, supra, 30 Conn. 497 (acts such as paying taxes, collecting rents, occupying and enjoying entire premises are " 'equivocal' " because they are consistent with right of cotenant to "possess for all and be willing or compelled to account to all"). In fact, the trial court determined that the foregoing activities constituted evidence of adverse possession only *after* relying on the "prior acrimonious litigation" and the parties' lack of communication to find that the plaintiff had overcome the presumption that possession by one cotenant is not adverse to the other. In other words, the trial court did not conclude that the plaintiff's use of the lot, standing alone, was sufficient to support a finding of notice, and neither does this court. The plaintiff did not make improvements to the lot and did not occupy the lot for any specific use after she acquired it from her mother in 1980. All that she did to physically occupy the lot was to mow and occasionally clear brush from the field, activities that hardly can be said to provide the type of clear and unmistakable notice required when a tenant in common is claiming exclusive and sole possession. Although the plaintiff also planted trees along two sides of the lot, there is no evidence that the trees could have been easily observed by the defendant because they were not adjacent to the road and were potentially blocked from view by a large section of woods. In addition, the trees were planted on the boundary of the lot in an area contiguous to the plaintiff's property such that an observer might have concluded that the plaintiff had planted the trees for the purpose of *separating* the lot from her other property. We thus conclude, as a matter of law, that the trial court's factual findings regarding intent and notice fall short of those deemed sufficient in past cases to support the conclusion that a tenant in common had acquired property by adverse possession.

In *Ruick*, for example, we found adverse possession by a tenant in common not only because she occupied the property for more than thirty years but because she had built a house on the property and lived there together with her daughters, made other improvements to the property, including the addition of a barn and garage, collected and retained rents on portions of the property, mortgaged the property, paid taxes on the property and sold a portion of property to the state. *Ruick* v. *Twarkins*, supra, 171 Conn. 154–55. Likewise, in *Camp*, we found adverse possession by a tenant in common who had made active use of the property as a parsonage for fifty-seven years. *Camp* v. *Camp*, supra, 5 Conn. 298, 302.

In this case, none of the plaintiff's conduct after 1987, when the defendant refused to sign the quitclaim deed and thereby asserted her ownership interest in the property, differed from the plaintiff's conduct before 1987, when she believed that she held full title to the lot. In other words, the plaintiff's conduct before 1987 was consistent with her belief that she owned the lot adversely to the world, and she did nothing after 1987 that would have given the defendant notice that she intended to disseize her of her individual interest in the lot, such as building a fence with a lock on the gate or posting "No Trespassing" signs around its perimeter.[27]

---

[27] The dissent's characterization of such measures as "extreme" is itself extreme, as is its assertion that building a fence or posting "No Trespassing" signs around the property was unnecessary in light of the parties' lack of communication over the past several decades. Footnote 8 of the dissenting opinion. It was *because* of the parties' lack of communication that it was important for the plaintiff to give the defendant "clear and unmistakable" notice of her intent. *Ruick* v. *Twarkins*, supra, 171 Conn. 157. The dissent has not pointed to a single finding of fact, or set of facts, by the trial court that could reasonably be construed as an action "of such an unequivocal nature and so distinctly hostile to the rights of the other cotenants that the intention to disseize [was] clear and unmistakable." Id. Accordingly, we disagree that the plaintiff would not have been required to demonstrate her intent by building a fence, posting signs or taking some other equivalent action.

See *Newell* v. *Woodruff*, supra, 30 Conn. 498 (person who has received inheritance in one sense holds "adversely to all the world . . . but not in the sense in which [that] term is used in the law of disseisin" because there is no wrongful intent).

The present case is reminiscent of *White* v. *Beckwith*, 62 Conn. 79, 80–81, 25 A. 400 (1892), in which the plaintiff, a tenant in common who held a warranty deed to the property and paid all of the property taxes for more than forty years, brought an action for ejectment on the ground that he had held actual, open and exclusive possession from 1849 to 1890 and thus had acquired full title by adverse possession. We disagreed, concluding that neither the plaintiff nor his predecessors had physically occupied or made use of the premises during the time in question. Id., 82. We noted that no buildings had been erected on the property, no business had been conducted on the property, and the plaintiff, who lived in Rhode Island and employed someone else to look after the property, had never entered onto the property and actually possessed it. Id., 81. Both the plaintiff and his predecessors merely had assumed that he held full title to the property by virtue of his deed. Id. We thus determined that we could not deem the plaintiff in full possession under the claim and color of title but, rather, that he continued to possess the premises in common with the defendant, who recently had built a boathouse on the property and had claimed the premises in common with the plaintiff. Id., 81–82; see also *Newell* v. *Woodruff*, supra, 30 Conn. 499 (concluding that trial court properly granted "nonsuit" in plaintiff's action for ejectment on ground that there was insufficient evidence of ouster because plaintiff's letters to defendant made no specific claim to property or demand of possession, and, therefore, his letters were "equivocal," and because evidence that defendant believed property was her own, that she rented property, that she casually

spoke of it as hers and that she paid taxes was " 'equivocal' " and, standing alone, did not indicate intent to dispossess plaintiff).

In sum, each claim must stand or fall on its own facts. In the present case, there is absolutely no evidence, much less the *"unequivocal"* and "distinctly hostile" evidence required under our law; (emphasis added) *Ruick* v. *Twarkins*, supra, 171 Conn. 157; that the plaintiff expressly notified or conveyed a clear and unmistakable intent to disseize the defendant of her one-sixth interest in the lot fifteen years before she instituted the present action. See id. Rather, the plaintiff testified, and her attorney argued, that she gave the defendant notice in 1997, only ten years earlier. Nor did the plaintiff treat the undeveloped lot in such a manner that the defendant would have believed that the plaintiff intended to exclude her. Although the plaintiff paid taxes, occasionally mowed the lot and allowed the town to use it for parking during the town fair, those actions are minimal in the context of an adverse possession claim involving cotenants, which requires clear and unmistakable notice of the intent to disseize; see id.; such as building an impassable fence or posting "No Trespassing" signs around the property's perimeter. Accordingly, we conclude that the trial court improperly rendered judgment for the plaintiff on her adverse possession claim.

The dissent declares that "the trial court made the necessary factual findings to support a conclusion that: (1) the plaintiff took the lot in 1980 under color of title, with the full knowledge of the defendant; (2) neither party at the time was aware of the defendant's interest in the lot; (3) over the ensuing twenty-seven years the plaintiff acted as if she were the exclusive owner of the lot, without interference from the defendant; and (4) other unique circumstances of the case, in tandem with the plaintiff's more credible testimony, made clear that the defendant was aware that the plaintiff intended

to hold the lot as the exclusive owner." Footnote 13 of the dissenting opinion. In other words, the dissent appears to believe that the trial court's factual findings support a conclusion of constructive notice.[28] The dissent, however, ignores the fact that the reviewing court is required to determine whether the trial court's findings as to intent and notice are supported by sufficient evidence, and that the trial court in the present case relied on the prior litigation, and not on the factors cited by the dissent, in determining that the plaintiff had given the defendant notice. Moreover, as previously discussed, the dissent disregards established Connecticut law that the cotenant must have knowledge of the cotenancy in order to give proper notice; see *Newell* v. *Woodruff*, supra, 30 Conn. 498–99; the defendant's express rejection of the plaintiff's request to sign the quitclaim deed, which represented an assertion of her own right to possess the property in 1987, and the plaintiff's concession and her attorney's argument that she gave notice to the defendant by way of the prior litigation, which commenced in 1997.

The dissent attacks the relevance of the plaintiff's concession, claiming that the trial court made no finding

---

[28] We find it ironic that the dissent believes the defendant should have been aware of the so-called evidence of "constructive notice" of the plaintiff's intent to dispossess the defendant but steadfastly refuses to recognize that the certificate of devise or descent, *which was recorded in the land records*, did not give the plaintiff constructive notice that she was not the sole owner of the property. See *PNC Bank, N.A.* v. *Kelepecz*, 289 Conn. 692, 701, 960 A.2d 563 (2008) ("the purpose of the land records is to give constructive notice to the world of instruments recorded therein"); *Kopylec* v. *North Branford*, 130 Conn. App. 146, 163 n.18, 23 A.3d 51 (2011) ("It is well established . . . that [e]very person who takes a conveyance of an interest in real estate is conclusively presumed to know those facts which are apparent upon the land records concerning the chain of title of the property described in the conveyance . . . . The law implies notice on the ground that it is conclusively presumed that a person will not purchase an interest in a piece of land without examining the condition of the record. Such an act would be required by common prudence." [Internal quotation marks omitted.]).

that the plaintiff did not give notice of her intent to dispossess the defendant until 1997, that it is not the role of this court to make such a finding, that there is nothing in the plaintiff's testimony indicating that she "never provided any notice" to the defendant prior to 1997 and that the plaintiff's testimony does not support the conclusion that she did not give notice until 1997 or that none of her actions prior to that time afforded the defendant constructive notice. Footnote 13 of the dissenting opinion. We emphatically disagree with each of these claims. First, implicit in the trial court's reference to the "prior acrimonious litigation" was the date the litigation commenced. The fact that the court did not expressly refer to the date is irrelevant. Insofar as the dissent claims that there is nothing in the record indicating that the plaintiff "never provided any notice" to the defendant prior to 1997, the dissent neglects to consider that there must be clear and convincing evidence that the plaintiff *did* provide notice and that the lack of such evidence in the record is dispositive. As for the plaintiff's response to the question of "how" she told the defendant of her adverse possession, her response was unambiguous. Although the dissent contends that the question merely required the plaintiff to explain "how," rather than "when," she gave notice to the defendant, either question would have elicited the same response because the event to which she referred, namely, the prior litigation, commenced at a clearly discernable time. Moreover, the plaintiff's attorney specifically argued, on the basis of her testimony, that, because of correspondence between attorneys for the parties *at the time of the prior litigation*, it would be "disingenuous" of the defendant to claim that she did not know that the plaintiff intended to dispossess her. Finally, although the plaintiff testified as to how she made use of the lot after she acquired it in 1980, she never testified that her conduct was intended to give

notice to the defendant or that the defendant even knew that she was using the lot. Finally, all of the plaintiff's activities before 1997 were consistent with the activities of a tenant in common who shares an interest in the property *without* an intent to wrongfully dispossess the other cotenant. Indeed, the trial court declined to conclude that the plaintiff had given notice solely on the basis of evidence regarding her use of the property before 1997. Accordingly, the only reasonable conclusion that can be drawn from the plaintiff's testimony is that she gave notice to the defendant in 1997 and did not give notice prior to that time.

The dissent also contends that the trial court's judgment should be affirmed on the basis of (1) principles[29] concerning notice that have not been adopted in Connecticut, and (2) theories that the plaintiff did not raise at trial and that the court did not consider. With respect to the former, the dissent relies on the principle that a cotenant may be deemed to have given proper notice of an intent to dispossess when the land is taken from the outset under an exclusive claim of right, as when the possessor is ignorant that the cotenancy exists, and

---

[29] The dissent all too frequently departs from Connecticut precedent and repeatedly relies on an annotation published approximately fifty years ago; see W. Allen, annot., "Adverse Possession Between Cotenants," 82 A.L.R.2d 5 (1962); which in turn relies on cases from other jurisdictions decided in the nineteenth and early twentieth centuries. Thus, to the extent that the annotation refers to any majority rule or trend in the case law, such a rule or trend does not reflect more current developments in the law over the last fifty years. In addition, the annotation contains only a handful of citations to Connecticut law, which we find significant in light of the dissent's representation that the annotation is based on a review of more than "1100 American cases . . . ." Text accompanying footnote 9 of the dissenting opinion. Accordingly, the dissent would have this court apply principles relating to notice that in some instances are not only unfamiliar in this jurisdiction but are in conflict with established Connecticut law, such as the requirement articulated in *Newell* that actual intent to dispossess requires actual knowledge that the other cotenant has an equal right to possession. *Newell* v. *Woodruff*, supra, 30 Conn. 498–99.

that, under such facts, " 'much less evidence' " is needed to establish adverse possession. As previously discussed, the dissent also relies on the principle that there is "no minimum time frame" beyond the statutory period that a cotenant is required to occupy the property exclusively, without more, to establish notice and adverse possession. Text accompanying footnote 27 of the dissenting opinion; see footnote 20 of this opinion. The dissent finally relies on the principle that the law permits "the trier of fact [to] find ouster, in the absence of any affirmative act of notification, under any other circumstances indicating by clear and convincing evidence that the cotenant in possession intended to hold the property exclusively and the cotenants out of possession had actual or constructive notice thereof."[30] None of these principles has been recognized in Connecticut, and the dissent's reasoning as to notice in cases of ignorance, in particular, is in direct conflict with this court's clear statement of the law in *Newell*. See footnote 22 of this opinion.

Similarly, the dissent concludes that the judgment should be affirmed on the basis of theories that the plaintiff did not advocate and that the trial court did not consider. Among these theories and conclusions are: (1) the plaintiff's mistaken belief that she alone had acquired the lot from her mother in 1980, together with other acts consistent with possession such as insuring the property, paying the taxes, allowing parking during the annual town fair, and otherwise acting as if she was the sole owner, afforded the defendant sufficient notice of the plaintiff's adverse and exclusive possession of the property and that, once the parties

---

[30] Even if this principle has been recognized, which is arguable, it is not applicable here in light of the plaintiff's concession that she gave notice to the defendant through the court and her attorneys when the prior litigation commenced in 1997.

discovered that there was a cloud on the title, "the onus lay on the defendant to indicate that she no longer intended to abide by the status quo," which the defendant failed to do; and (2) the plaintiff gave notice and acquired possession simply by occupying the property exclusively for twenty-seven years, beginning in 1980, when she acquired her mother's interest, until 2007, when she commenced the present litigation.

In reaching these conclusions, the dissent fails to acknowledge that this court is limited to reviewing whether the trial court's findings are clearly erroneous and whether, on the basis of those findings, the court properly concluded that the plaintiff acquired the lot by adverse possession. Nevertheless, the dissent's conclusions under each of the foregoing theories are defeated by the plaintiff's concession that she did not give notice to the defendant until 1997. Even if this were not the case, however, the plaintiff did not plead or brief the theories on which the dissent relies, and the trial court made no findings and reached no conclusions in support of those theories. Accordingly, this court should not address the issue of a cotenant's responsibility to reassert ownership after the other cotenant takes possession under the mistaken belief that she is the sole owner of the property and the issue of whether exclusive possession for more than the statutory period, without more, is sufficient to prove adverse possession because the dissent's legal analysis is inapplicable and inappropriate in light of the circumstances in this case.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant on the plaintiff's complaint and for further proceedings on the defendant's counterclaim seeking sale or partition of the lot.

In this opinion NORCOTT, McLACHLAN and VERTE-FEUILLE, Js., concurred.

ROGERS, C. J., with whom PALMER and EVELEIGH, Js., join, dissenting. I respectfully dissent. Although the majority properly reviews the trial court's factual finding that the named plaintiff, Theresa P. O'Connor,[1] satisfied each element of adverse possession according to a sufficiency of the evidence standard, I believe the majority fails to afford the trial court the degree of deference that this court routinely affords in sufficiency challenges. Specifically, I cannot agree with the majority's conclusion that the record contains "absolutely no evidence" that the plaintiff intended to hold a parcel of land (lot) as the exclusive owner prior to 1997, and that the defendant, Dorothy Larocque, was on notice thereof, given the plaintiff's express testimony to that effect. Accordingly, I would affirm the judgment of the trial court.

I begin by noting that, were this an adverse possession case not involving cotenants, it is clear that the standard for adverse possession would be satisfied. Even setting aside the various uses to which the plaintiff and her husband, John J. O'Connor, have put the lot over the past several decades—planting trees, mowing the lawn, clearing brush, leasing it for parking—the fact that the plaintiff paid the property taxes, insured the property and was listed, with her husband, as the sole taxpayer of record provides " 'powerful evidence' " of adverse possession. *Wren* v. *Parker*, 57 Conn. 529, 531, 18 A. 790 (1889); *Porter* v. *Morrill*, 108 Conn. App. 652, 666–67, 949 A.2d 526, cert. denied, 289 Conn. 921, 958

---

[1] John J. O'Connor also was a plaintiff at trial, but is not a party to this appeal. For convenience, we refer to Theresa P. O'Connor as the plaintiff.

A.2d 152 (2008).[2] Accordingly, the sole issue raised by this appeal is the extent to which the fact that the parties are cotenants impacts the adverse possession analysis.

Considering first the standard of review, I agree with the majority that adverse possession presents a mixed question of law and fact. Because it is not entirely clear what degree of deference the majority would afford to the trial court's findings,[3] however, I review what I

[2] It is not surprising that the trial court, in a prior case between the present parties involving virtually identical facts pertaining to two additional lots, concluded that the present defendant adversely possessed those two lots owned by the present plaintiff. See *Larocque* v. *Percoski*, Superior Court, judicial district of Tolland at Rockville, Docket No. CV-97-0063927-S (February 18, 2003). The majority explains why, in its view, the outcome of the prior case is not material to the present dispute between the parties. See footnote 6 of the majority opinion. Although I agree that the *outcome* of the prior case is unimportant for present purposes, the pleadings offered and the positions taken by the present defendant in that action are highly relevant here. Indeed, although it is true that the trial court in the present case rejected the plaintiff's "equitable" claim—that the plaintiff should succeed in her adverse possession action merely because the defendant successfully adversely possessed against her in the prior action—the court expressly left open the possibility that "certain aspects of the previous litigation among the parties may have a bearing on the resolution of the present suit, such as by way of *collateral estoppel, judicial admissions or evidentiary admissions* . . . ." (Emphasis added.) As I discuss in this dissenting opinion, it is in precisely that capacity that the trial court properly relied on the prior litigation in finding that the present defendant was on notice that the plaintiff was holding the lot adversely to her.

[3] The majority, for example, concedes that under the clearly erroneous standard of review, it is the "duty [of] an appellate tribunal to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) Elsewhere in the opinion, however, the majority contends that "[i]t is the province of the . . . court . . . to decide as a matter of law whether the facts found . . . fulfill the requirements of [adverse] possession," and that "[a]pplication of the pertinent legal standard to the trial court's factual findings is subject to our plenary review." What is not clear is whether the majority considers the conclusion that a particular element of adverse possession such as notice or intent is satisfied in a given case to be a factual finding, subject to deferential appellate review, or, alternately, a legal conclusion, subject to de novo review. As I explain in footnote 5 of this dissenting opinion, the overwhelming weight of authority supports the former position. Of course, I do agree with the majority that, even under a deferential standard of review, reversal is warranted as a matter of law if:

believe to be the well established governing law. First, I agree with the majority that the definition of adverse possession, and the legal standards governing a finding of adverse possession, are questions of law over which this court exercises plenary review. It is the proper province of an appellate court, then, to identify the constituent elements of adverse possession,[4] to define those elements, and to impose any rules or restrictions as to the circumstances under which those elements may be satisfied. Second, I agree with the majority that the finding of basic evidentiary facts is the proper province of the trier of fact, and that such findings are reviewable by an appellate court only for clear error.

Third, and of particular importance for the present case, I believe it is well settled that the trier of fact is also tasked with applying those basic evidentiary facts to the elements of adverse possession, and with finding whether each of those elements is satisfied.[5] Because

(1) there is no evidence to support the trial court's factual findings; (2) the evidence is so slight that no reasonable fact finder could find the elements of adverse possession satisfied by clear and convincing evidence; or (3) the factual findings fail to satisfy the established legal standards for adverse possession. That is not the case here.

[4] For adverse possession to lie, possession must be "actual, [open] and notorious, exclusive, continuous and hostile" throughout the statutory period. *Ahern* v. *Travelers Ins. Co.*, 108 Conn. 1, 4–5, 142 A. 400 (1928); see also 3 Am. Jur. 2d 95–96, Adverse Possession § 10 (2002). In addition, in the case of adverse possession between cotenants, it is necessary to demonstrate that the cotenant in possession *intended* to hold adversely to the ousted cotenant, and that the latter was on actual or constructive *notice* of that intent.

[5] This court has stated repeatedly that whether the constituent elements of adverse possession are satisfied is ultimately a question of fact, subject to deferential review. See, e.g., *Caminis* v. *Troy*, 300 Conn. 297, 306, 12 A.3d 984 (2011) ("our scope of review is limited . . . [b]ecause adverse possession is a question of fact for the trier" [internal quotation marks omitted]); *Goldman* v. *Quadrato*, 142 Conn. 398, 404, 114 A.2d 687 (1955) ("Whether possession is adverse in character is a question of fact. . . . Since the [trial] court found all the essential elements of an adverse possession . . . the court was correct in its judgment." [Citation omitted.]); *Spencer* v. *Merwin*, 80 Conn. 330, 336, 68 A. 370 (1907) ("[a]dverse possession is a question of fact, and when found by the trial court will not be reviewed by

the party seeking to possess adversely against a coten-

this court as a conclusion from evidential facts, unless it appears that these facts, or some of them, are legally or logically necessarily inconsistent with that conclusion" [internal quotation marks omitted]); *White* v. *Beckwith*, 62 Conn. 79, 82, 25 A. 400 (1892) ("[i]t is true that [the trial court] has found certain [evidentiary] facts . . . from the existence of which, if they had satisfied the mind of the trier, it was for him to find whether any entry had been made or possession taken and held under the deeds, and if so, whether such possession was actual, open, exclusive and hostile"); see also annot., 82 A.L.R.2d 301, § 86 (1962) ("questions whether in a given case [the essential elements of adverse possession between cotenants] are present are ordinarily issues of fact for the jury, and can become matters of law only when the evidence, or want of evidence, is conclusive").

In particular, we have emphasized that the determination of whether the elements of adverse possession at issue in the present case—notice and intent—are satisfied is for the trier of fact. See *Ruick* v. *Twarkins*, 171 Conn. 149, 161, 367 A.2d 1380 (1976) ("[i]n the final analysis, whether [the plaintiff's] possession is adverse [to her cotenants] is a question of fact for the trier"); *Lengyel* v. *Peregrin*, 104 Conn. 285, 288, 132 A. 459 (1926) ("ouster . . . is a question of fact"); *Standard Co.* v. *Young*, 90 Conn. 133, 137, 96 A. 932 (1916) ("The only contested question of fact in the case was . . . whether there had been an ouster of the [cotenant] defendants. This was a proper question for the jury."); *Bryan* v. *Atwater*, 5 Day (Conn.) 181, 187 (1811) (whether possession was adverse to cotenant deemed "proper subject for the consideration of the jury," unless by law only one result is possible, as where life tenant purports to possess adversely against lessor).

These statements are consistent with our general rule that intent and notice are questions of fact subject to deferential appellate review. See, e.g., *State* v. *Hedge*, 297 Conn. 621, 658–59, 1 A.3d 1051 (2010) ("[i]t is well established that the question of intent is purely a question of fact . . . the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one" [internal quotation marks omitted]); *State* v. *Hinton*, 227 Conn. 301, 323, 630 A.2d 593 (1993) ("the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact . . . entitled to great deference" [citation omitted; internal quotation marks omitted]); *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 325, 612 A.2d 1197 (1992) (reviewing finding of constructive notice according to sufficiency of evidence standard); *Lukas* v. *New Haven*, 184 Conn. 205, 208, 439 A.2d 949 (1981) ("[w]hether the plaintiff sustained his burden of proof on the [issue] of . . . constructive notice . . . presented [a question] of fact for the trier to determine upon all the evidence"); *Baker* v. *Ives*, 162 Conn. 295, 307, 294 A.2d 290 (1972) ("constructive notice is a question of fact for the jury and unless . . . [only] one conclusion could be found, its determination should be left to the trier"). None of the adverse possession cases cited by the majority is to the contrary, and the majority offers no rationale for reviewing findings of notice and intent differently in

ant must establish those elements by clear and convincing evidence; *Wildwood Associates, Ltd.* v. *Esposito*, 211 Conn. 36, 42, 557 A.2d 1241 (1989); the trier's finding that an element of adverse possession is satisfied is reviewable under a sufficiency of the evidence standard. See *Caminis* v. *Troy*, 300 Conn. 297, 306, 12 A.3d 984 (2011). This is also a deferential standard of review. "[I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 645–46, 904 A.2d 149 (2006); see also *Considine* v. *Waterbury*, 279 Conn. 830, 858, 905 A.2d 70 (2006) (noting " 'rigorous' " standard that must be met before reviewing court may set aside verdict for insufficient evidence); *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, 239 Conn. 769, 778, 687 A.2d 1270 (1997) ("[o]nly in the clearest circumstances where the conclusion found could not reasonably be reached will the trier's determination be disturbed" [internal quotation marks omitted]). Accordingly, this court has explained that "[a] trial court's findings in an adverse possession case, if supported by sufficient evidence [in the pleadings and the record as a whole], are binding on a reviewing court . . . ." (Internal quotation marks omitted.) *Caminis* v. *Troy*, supra, 306; see also 2 C.J.S. 219–20, Adverse Possession § 292 (2003)

---

adverse possession cases than in every other area of this court's jurisprudence.

(notwithstanding burden to prove adverse possession by clear and convincing evidence, question of whether elements are satisfied is one for trier of fact where even slight evidence exists).[6]

I believe that the record here contained sufficient evidence for the trier of fact to have found that the

[6] To the extent that the majority relies on *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 931 A.2d 237 (2007), an inverse condemnation case, for the proposition that plenary review of the trial court's factual conclusions is warranted in the present case, its reliance is misplaced. In *Bristol*, we repeated, as we have on numerous other occasions, that a "trial court's conclusions *must stand* unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." (Emphasis added; internal quotation marks omitted.) Id., 83. This language is by its very nature deferential, in that it requires a reviewing court to uphold a trial court's conclusions unless, as a matter of law, they could not flow from the factual record. Indeed, in the more than sixty cases in which we used the quoted language prior to *Bristol*, we never once equated it with a plenary or de novo standard of review. To the contrary, the language frequently appears in the context of reviewing the sufficiency of a trial court's *factual* conclusions, where it is clear that our standard of review is deferential. See, e.g., *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622–23, 866 A.2d 582 (2005) ("Waiver is a question of fact. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . Therefore, the trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." [Citations omitted; internal quotation marks omitted.]); *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 99–100, 626 A.2d 1292 (1993) ("The trial court was presented with conflicting testimony as to the value of the property, and concluded that the report and testimony of the plaintiff's expert was the most credible. In any assessment case in which the trial court is confronted with conflicting appraisal methods, it is a proper function of the court to give credence to one expert over the other. . . . The conclusions reached by the trial court must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law. . . . We will not disturb the trial court's adoption of the plaintiff's valuation of the property, therefore, unless the appraisal was legally invalid." [Citations omitted; internal quotation marks omitted.]); *Horton* v. *Meskill*, 172 Conn. 615, 639, 376 A.2d 359 (1977) ("A finding is to be read to uphold the judgment. Every reasonable presumption will be indulged in to support it. . . . The conclusions reached by the trial court must stand unless they are legally or logically inconsistent with the facts

plaintiff ousted[7] the defendant, and I further believe that nothing in the law precluded that factual finding. Accordingly, I would conclude that the trial court's decision was not clearly erroneous.

I now turn to the specific legal principles governing adverse possession between cotenants, and the various means through which such possession may be proven. I agree with the majority that any party seeking to establish adverse possession must demonstrate by clear and convincing evidence that her use of the land was "actual, [open] and notorious, exclusive, continuous and hostile" throughout the statutory period. *Ahern* v. *Travelers Ins. Co.*, 108 Conn. 1, 4–5, 142 A. 400 (1928). I further agree that, in the cotenant context, the would-be adverse possessor bears the additional burden of proving not only that she intended to hold the land

found or unless they involve the application of some erroneous rule of law material to the case." [Citations omitted; internal quotation marks omitted.]); *Esposito* v. *Commissioner of Transportation*, 167 Conn. 439, 440–41, 356 A.2d 175 (1974) ("The defendant has . . . made a wholesale attack on the referee's finding[s] [of fact]. Such an attack on a finding rarely produces beneficial results and in effect the defendant seeks to have this court retry the issues. This is not our function. . . . The conclusions reached by the trier must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." [Citation omitted.]); *Southern New England Contracting Co.* v. *State*, 165 Conn. 644, 651–52, 345 A.2d 550 (1974) ("These conclusions are to be tested by the finding, as corrected. . . . They must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. . . . The wisdom of these policies is pointed out with particular force by a case such as this where the factual framework is extremely complex and where, as the trial court pointed out, there were sharp conflicts in the evidence." [Citations omitted; internal quotation marks omitted.]). Accordingly, to the extent that we suggested in *Bristol* that this court engages in a plenary review of the sufficiency of the evidence to support a trial court's factual conclusions, that statement was inconsistent with the weight of our case law.

[7] Although the cases are inconsistent in their use of the term "ouster," at times equating it with a physical eviction of the rightful owner, and at other times equating it with adverse possession in general, in this dissenting opinion I use the term merely to refer to the additional elements of intent and notice necessary to establish adverse possession among cotenants.

adversely, but also that the cotenant was on notice of this intent. *Ruick* v. *Twarkins*, 171 Conn. 149, 158–59, 367 A.2d 1380 (1976). These dual elements of intent and notice, which may collectively be termed "ouster," are necessary in light of the default assumption that any action by a cotenant as to common land is performed with the consent and for the benefit of all cotenants. Id., 157; *Bryan* v. *Atwater*, 5 Day (Conn.) 181, 191 (1811); annot., 82 A.L.R.2d 23–24, § 2 (1962). Lastly, I share the majority's view that there is no express notification requirement; notice to the ousted cotenant may be either actual or constructive. See generally, annot., supra, 82 A.L.R.2d § 50.

I would emphasize, however, that "[n]otice of the hostility of the possession resulting from acts or conduct of [a cotenant] possessor may appear in so many ways that judges and text writers have not undertaken an enumeration." Id., p. 235. The only requirement is that the trier of fact find, by clear and convincing evidence, that the possessory cotenant intended to hold the common land exclusively, and that the ousted cotenant was on notice thereof. Id. Although the majority, relying on some dicta in the case law, appears to believe that there can be adequate notice of a cotenant's intent to dispossess only when there is either an express notification or something closely akin to it, a thorough review of the cases reveals that there is no such requirement.[8]

---

[8] Although the majority disputes the contention that it requires something closely akin to express notice, the examples it offers of how the plaintiff might have notified the defendant of her intent to hold the lot exclusively are, in fact, extreme measures, such as enclosing this small, undeveloped rural lot within an impassable barrier and surrounding it with no trespassing signs. The majority also concludes its analysis by declaring that "there is absolutely no evidence . . . that the plaintiff *expressly notified or conveyed* a clear and unmistakable intent to disseize the defendant . . . ." (Emphasis added.) It is clear from the authorities cited in this dissent that such extreme measures are not necessary, especially in a case such as this, where there has been virtually no communication between the parties over the past three decades, during which time the defendant never once entered onto the lot or contributed to its upkeep in any way.

In his authoritative, 300 page annotation of the legal requirements for adverse possession among cotenants, W. W. Allen reviewed more than 1100 American cases on the subject;[9] id.; and concluded that, notwithstanding any dicta to the contrary, the dominant view in this country "is that outward or notorious acts of exclusive

It also bears noting that, while the majority appears to believe that a claimant must take some affirmative step to give her cotenant notice of her intent to hold exclusively, the very authorities cited by the majority make clear that *giving* notice is unnecessary; all that is required is that the ousted cotenant *have* notice of the adversity of the claimant's possession. See, e.g., *Ruick* v. *Twarkins*, supra, 171 Conn. 158 (there also must be proof of "an ouster and exclusive possession so openly and notoriously hostile that the cotenant will *have notice* of the adverse claim" [emphasis added]).

[9] E. Orr, comment, "Adverse Possession Against Tenants in Common in Tennessee," 37 Tenn. L. Rev. 776, 793 n.84 (1970) (citing Allen's annotation in 82 A.L.R.2d 5 and recognizing Allen's review of 1100 cases); see also *Shives* v. *Niewoehner*, 191 N.W.2d 633, 637 (Iowa 1971) ("excellent annotation"); *Wengel* v. *Wengel*, 270 Mich. App. 86, 98, 714 N.W.2d 371 (2006) ("[t]he law of adverse possession as between cotenants is thoroughly discussed in [Allen's annotation in] 82 A.L.R.2d 5"); *McCann* v. *Travis*, 63 N.C. App. 447, 451, 305 S.E.2d 197 (1983) (referring readers to Allen's annotation for unique set of rules governing adverse possession between cotenants); *Nelson* v. *Christianson*, 343 N.W.2d 375, 378 (N.D. 1984) (praising Allen's work as "exhaustive annotation"); *Caywood* v. *January*, 455 P.2d 49, 51 (Okla. 1969) ("exhaustive" annotation); *Silver Surprize* v. *Sunshine Mining Co.*, 15 Wn. App. 1, 32 n.11, 547 P.2d 1240 (1976) (McInturff, C. J., dissenting) ("extensive annotation"); J. Legg, "Real Property Actions and Proceedings Law Section 541: The Mind-Buster Busted," 59 Alb. L. Rev. 1485, 1516 n.198 (1996) ("broad discussion of adverse possession between co-tenants"). To its credit, the trial court relied on Allen's annotation in concluding that the plaintiff satisfied the legal requirements for adverse possession against a cotenant. The majority, by contrast, inexplicably dismisses a treatise that courts and legal scholars continue to recognize as the definitive source on the topic. While the majority rejects Allen's work for having been "published . . . fifty years ago," in fact the annotation has been recently updated and indicates no shift in the majority position that constructive notice of the intent to dispossess a cotenant may be given in myriad ways, and is to be determined by the trier of fact based on the unique circumstances of each case. See annot., supra, 82 A.L.R.2d 5, as updated by the Later Case Service (2001) §§ 40, 52, 53, 60 and 62. Nor does the majority offer any evidence that the prevailing rule established over the course of hundreds of years of common law has suddenly changed in recent years. As to the majority's contention that Allen's compendium reflects a statement of the law "unfamiliar in this jurisdiction," I would emphasize that every theory of constructive notice for which I cite Allen's annotation has been embraced, either expressly or implicitly, by appellate courts in Connecticut.

ownership . . . are not essential in any instance in which the hostile character of the possession is otherwise distinctly manifested and the fact thereof brought home to the possessor's cotenants." Id., p. 24. Allen further explains in the annotation that "the conclusion to be drawn from the cases as a whole, and which [follows] in reason as well, is that where the possession is in fact hostile and adverse, it is adverse in law if its adverse character is *in any manner* . . . plainly manifested to the possessor's cotenants." (Emphasis added.) Id., p. 69.[10]

Bearing out Allen's analysis, this court has found—or affirmed a trial court finding of—adverse possession in almost every cotenancy case in which we have considered the question. See, e.g., *Ruick* v. *Twarkins*, supra, 171 Conn. 161; *Hagopian* v. *Saad*, 124 Conn. 256, 259, 199 A. 433 (1938); *Lucas* v. *Crofoot*, 95 Conn. 619, 626, 112 A. 165 (1921); *Goodwin* v. *Bragaw*, 87 Conn. 31, 39–40, 86 A. 668 (1913); *Harrison* v. *International Silver Co.*, 78 Conn. 417, 422, 62 A. 342 (1905). In two additional cotenancy cases, we made clear that a finding of adverse possession would have been legally permissible. See *Standard Co.* v. *Young*, 90 Conn. 133, 135, 138–39, 96 A. 932 (1916) (reversing on other grounds); *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 192–93 (trial court improperly instructed jury that, by law, defendant cotenant could not have adversely possessed property, and opining that "the verdict ought to have been for the defendant"); see also *Ricard* v. *Williams*, 20 U.S.

---

[10] Allen is in good company. Later Chief Justice Taft, writing for the United States Court of Appeals for the Sixth Circuit, reached the identical conclusion in *Elder* v. *McClaskey*, 70 F. 529, 542–43 (6th Cir. 1895): "There are some authorities in which language is used indicating that, before a tenant in common can hold adversely to his cotenants, he must prove that his cotenants had actual knowledge of his intention to assume exclusive possession, but it will be found that the language was not necessary to the decision of the cases under consideration. . . . By the overwhelming weight of authority . . . actual notice is not necessary . . . ." (Citation omitted.)

(7 Wheat.) 59, 116, 119–20, 5 L. Ed. 398 (1822) (applying Connecticut law).[11] In fact, in the 200 years that have passed since this court first heard a case of adverse possession among cotenants, the present case represents the first instance, to my knowledge, in which we have ever reversed on the merits a trial court's finding in favor of the party in possession.[12]

Over the course of that history, while noting that ouster must be assessed on the basis of the unique circumstances of each case; *Ricard* v. *Williams*, supra, 20 U.S. 106; *Lucas* v. *Crofoot*, supra, 95 Conn. 623–24; see also annot., supra, 82 A.L.R.2d § 40; Connecticut courts have recognized a number of specific methods of providing constructive notice sufficient to establish the ouster of a cotenant. For example, the law permits the trier of fact to find ouster when: (1) the party in possession takes and holds the land under an exclusive claim of right, rather than as an avowed cotenant; (2) the ousted cotenant acquiesces for a long period of time in the possessor's exclusive use of the property, without either party acting as one might expect of a cotenant; or (3) the circumstances otherwise indicate that the ousted cotenants were on constructive notice of the possessor's intent to hold adversely to them. In the present case, the record contains sufficient evi-

---

[11] Perhaps unsurprisingly, the majority concludes that the present case is more akin to *White* v. *Beckwith*, 62 Conn. 79, 83, 25 A. 300 (1892), the lone case, to my knowledge, in which this court has found against a cotenant purporting to adversely possess against his tenants in common. It is noteworthy, however, that in *Beckwith* this court did not find that the plaintiff could not, as a matter of law, have adversely possessed the contested property. Rather, this court clarified that the trial court *could* have found adverse possession on the facts of that case, but we deferred to the trier's conclusion that the plaintiff's possession was not in fact adverse to the defendants. Id., 82–83. Here, the trial court found otherwise, and I would likewise defer.

[12] The majority's statement that "only five [of the nine cases decided by this court or the United States Supreme Court] have been decided in favor of the claimant" is somewhat misleading, given the fact that all nine cases made clear that a finding of adverse possession would have been legally permissible.

dence for the trial court to have found that all three theories apply.[13]

[13] The majority posits that these theories of constructive notice: (1) have not been adopted by Connecticut courts; (2) were neither raised at trial by the plaintiff nor considered by the trial court; and (3) are precluded by the plaintiff's alleged admission that the defendant was not on notice of her intent to hold the lot exclusively until 1997. These claims are simply untrue.

First, each theory has been embraced, at least implicitly, under Connecticut law. Indeed, of the three theories, the second, which focuses on lengthy acquiescence by the ousted cotenant, is *conceded* by the majority to be an accepted part of Connecticut law, and the third theory, which looks to the totality of the circumstances, is not really a distinct theory at all but merely the unexceptional proposition that the trier of fact may find that a cotenant is on notice wherever the unique circumstances of the case reasonably support that conclusion. Although the majority and I may differ as to what circumstances would constitute clear and convincing evidence, the majority, having conceded that constructive notice of adverse possession is possible, can hardly disclaim the principle that such notice is to be ascertained by the trier of fact on the basis of the circumstances of the case.

Second, the plaintiff's attorney did elicit testimony in support of these theories at trial. Indeed, the plaintiff herself emphasized that her claim of exclusive possession was based not only on a long history of sole possession and acts of ownership, without contribution from the defendant, but also on the fact that all parties believed that she had acquired full title to the lot in 1980.

In addition, the trial court made the necessary factual findings to support a conclusion that: (1) the plaintiff took the lot in 1980 under color of title, with the full knowledge of the defendant; (2) neither party at the time was aware of the defendant's interest in the lot; (3) over the ensuing twenty-seven years the plaintiff acted as if she were the exclusive owner of the lot, without interference from the defendant; and (4) other unique circumstances of the case, in tandem with the plaintiff's more credible testimony, made clear that the defendant was aware that the plaintiff intended to hold the lot as the exclusive owner. It is true that the trial court's ultimate conclusions are couched in general terms, alluding to the "bitter relationship" and "history between" the parties, and the "unique facts" of the case, and that it did not pin on its findings the precise labels I have used in this dissenting opinion. It might have been preferable for the court to have cited to all of the case law referenced herein, or to have connected the dots more directly between its evidentiary findings and its ultimate conclusion that the elements of adverse possession were satisfied, but there is no such requirement. Rather, where the sufficiency of the evidence to support the verdict is challenged on appeal, the reviewing court must "give the evidence the most favorable reasonable construction in support of the verdict . . . ." (Internal quotation marks omitted.) *Kimberly-Clark Corp.* v. *Dubno*, 204 Conn. 137, 153–54, 527 A.2d 679 (1987). Moreover, where a memorandum of decision is ambiguous, this court is not precluded from affirming the judgment on a basis not expressly cited by the trial court. See *Skuzinski* v. *Bouchard Fuels, Inc.*, 240 Conn. 694, 703, 694 A.2d 788 (1997); *Wenzel* v.

*Danbury*, 152 Conn. 675, 676–77, 211 A.2d 683 (1965). Here, it strains credulity for the majority to suggest that, when all reasonable inferences are drawn in favor of the verdict, there was literally no evidence to support the court's determination that the defendant knew that the plaintiff was holding the lot adversely to her.

Lastly, the majority relies heavily on its finding that the plaintiff herself conceded that she did not give notice of her intent to dispossess the defendant until 1997. Initially, I note that the trial court did not make this finding, and that it is not our role to do so. *In re Jorden R.*, 293 Conn. 539, 559 n.17, 979 A.2d 469 (2009). Moreover, the majority discerns this allegedly dispositive concession solely from the fact that, when asked on cross-examination how she could have *told* the defendant that she was adversely possessing the lot when they were not on speaking terms, the plaintiff replied: "Through court and lawyers. When . . . the question of the other two lots came up . . . it was brought up." There is literally nothing in this testimony to support the view that the plaintiff never provided any notice to the defendant prior to 1997, or that not only did the plaintiff not *tell* the defendant of her adverse intentions until 1997, but that none of her actions prior to that time afforded her sister even *constructive* notice thereof. The question to the plaintiff was not "when did you first tell her?" or even "when did you tell her?" It was "*how* did you tell her . . . ?" (Emphasis added.) There is no indication, given the context of the question, that the reply elicited or offered was intended to speak to the issue of when the plaintiff first sought to notify the defendant of the adversity of her holdings. Moreover, even if 1997 were the first time that the plaintiff actively sought to give the defendant notice, the relevant legal question is not when the plaintiff *gave* notice but, rather, when the defendant *had* notice. See footnote 8 of this dissenting opinion. The fact that the plaintiff *told* the defendant something in 1997 says absolutely nothing about what constructive notice the defendant might have had prior to that time. To construe this one statement by the plaintiff as a broad concession that she failed to satisfy the elements of adverse possession, and to credit it over her *explicit* testimony to the contrary, runs afoul of this court's long-standing commitment to "give the evidence the most favorable reasonable construction in support of the verdict . . . ." (Internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 185, 2 A.3d 873 (2010).

Similarly, from one brief reference to the parties' "prior acrimonious litigation" in the memorandum of decision, the majority concludes that the trial court relied on the prior litigation as the primary basis for its conclusion that the plaintiff held the lot adversely to the defendant, and that its decision was therefore clearly erroneous. The majority gives no credence to the various other factors discussed by the trial court in its memorandum of decision and articulation, including: the history between the parties; their bitter relationship and twenty-five years of not speaking; the fact that the defendant never claimed an ownership interest in the lot; the deeding of the lot to the plaintiff; the defendant's lack of credibility; and the plaintiff's general use of the lot as an exclusive owner. Nor does the majority consider the possibility that in referencing the prior litigation, the court was simply crediting the suggestion by the plaintiff's counsel during closing argument, that the defendant cannot plausibly deny that she was on notice when she

First, a cotenant is placed on constructive notice when she is aware that the adverse possessor takes common land from the outset under an exclusive claim of right, rather than as an avowed cotenant. This occurs when, for example, the possessor takes the land under exclusive color of title, or when she is ignorant of the existence of the cotenancy. "[T]he rule that, in order to amount to an ouster of his cotenants, the acts of the possessor must be of the most open and notorious character, clearly giving notice . . . that the possessor's intention is to exclude his cotenant . . . has no application to one whose possession commenced neither avowedly as a cotenant nor under an instrument defining his interest to be that of a cotenant." Annot., supra, 82 A.L.R.2d 168, § 41. In those situations, the majority rule is that "in the case of an entry hostile in its inception much less evidence is needed to establish that the possession is legally adverse to the possessor's cotenants . . . ." Id., p. 167; see also 3 Am. Jur. 2d, Adverse Possession § 201 (2002).

In the case of common land taken under color of title in *Lucas* v. *Crofoot*, supra, 95 Conn. 626–27, this court held that a cotenant's conveyance of a quitclaim deed purporting to confer exclusive title was tantamount to ouster so that the grantees held the land adversely to the other cotenants. We explained that "[w]hen the grantees recorded this deed and entered and took possession thereunder, their possession is presumed to have been under the deed itself and not under the title of the cotenants." Id., 624; see also *Hagopian* v. *Saad*, supra, 124 Conn. 259 (plaintiff's possession was referable to deed under which he held); *White* v. *Beckwith*, 62 Conn. 79, 82, 25 A. 400 (1892) (legal presumption is

essentially alleged in her own action that the same adversity had existed since at least 1982. In short, I see no indication that the majority has tried to give the evidence, and inferences drawn therefrom, the most favorable reasonable construction in support of the verdict, as required by our law.

that tenant in common entering and occupying land openly and exclusively takes in conformity with deed as sole owner); *Clark* v. *Vaughan*, 3 Conn. 191, 193–94 (1819) (jury was authorized to find ouster solely on basis of cotenant in possession's claim to hold entire estate by partition deed). While acknowledging that a quitclaim deed conveys only that " 'right, title and interest' " held by the grantor, and so is not necessarily inconsistent with a cotenancy; *Lucas* v. *Crofoot*, supra, 624; we nevertheless concluded that holding under a quitclaim can be " 'good proof to show the [adverse] nature of the occupancy . . . .' " Id., 625.

The majority notes, correctly, that the quitclaim deed in *Lucas* differed from the one in the present case in that the deed in *Lucas* recited that the grantor had acquired all outstanding interest in the property. Id. I do not dispute that such a deed provides *stronger* evidence that the grantee intends to take the land as sole owner than does a conventional quitclaim deed, as in the present case, which merely conveys such right and title as the grantor holds in the property.[14] For present purposes, however, the relevant question is whether a con-

[14] Although I agree with the majority that the quitclaim deed in *Lucas* conferred stronger color of title than the deed in the present case, I believe that *Lucas* nevertheless established the broader proposition that taking under color of any quitclaim deed can provide at least some indication of the grantee's intent to hold the property exclusively.

The majority also suggests, in footnotes 19 and 25 of its opinion, that I am ignoring "an essential legal fact of significance," to wit, that in the present case the land records contained a certificate of devise or descent indicating that Doris Percoski, the mother of both the plaintiff and the defendant, only acquired one third of the lot upon the passing of her husband. The plaintiff's action alleges a claim of adverse possession, not a claim of rightful ownership. To establish adverse possession, she need not prove that she had a legal right to the lot, or even that she had a reasonable belief that the lot was hers. She need only prove that she *intended* to hold the lot exclusively. The fact that she took the lot under color of a deed that she *believed* gave her full title demonstrates that intent to hold the lot as her own, regardless of how reasonable or unreasonable that belief might have been. In addition, the plaintiff must prove that the defendant, her cotenant, was on notice of her intent to hold the lot exclusively. Again, if the defendant *believed* that

ventional quitclaim deed, which is nevertheless believed by all parties to convey full title to the property, provides *any* evidence to support the trial court's finding that the plaintiff intended to hold the land exclusively and that the defendant was under no illusion otherwise. I believe that it does.

In *Lucas* itself, this court relied on a prior Connecticut case, *Cady* v. *Fitzsimmons*, 50 Conn. 209, 214 (1882), in which a deed that was described by the court in *Lucas* simply as "presumably a quitclaim" was held to demonstrate the adversity of the grantee's holding thereunder. *Lucas* v. *Crofoot*, supra, 95 Conn. 625. Indeed, the court in *Lucas*, citing *Rogers* v. *Hillhouse*, 3 Conn. 398, 403 (1820), emphasized that "*any evidence* conducing to prove that the possession was accompanied with a claim of title, and that it was the intention of the possessor to hold exclusively for himself, was undoubtedly admissible to support title by adverse possession." (Emphasis added; internal quotation marks omitted.) *Lucas* v. *Crofoot*, supra, 625. The decision in *Rogers* is also instructive in that it clarifies that a deed that cannot itself confer legal title may nonetheless be "good proof, to [show] the nature of the occupancy, and that it was adverse." *Rogers* v. *Hillhouse*, supra, 403–404. Indeed, "[e]ven parol declarations, accompanying an entry . . . have been held good evidence, to evince the [adverse] character of a possession." Id., 404.[15] At the very least, as we explained in *Lucas*, holding under color of title of a quitclaim deed places an

the plaintiff had acquired full title from their mother, and if she knew that the plaintiff also believed that, then the defendant was on notice of the plaintiff's adverse intent. The fact that either party easily could have discovered the truth by inspecting the land records would be relevant to a claim of *rightful* legal ownership but has no bearing on the questions at issue here.

[15] The majority, while attempting to distinguish *Lucas* from the present case, neglects to discuss any of the other Connecticut cases or the cases from other jurisdictions that I cite in this dissenting opinion, which support the commonsense rule that a quitclaim deed can confer color of title sufficient to support a claim of adverse possession when all parties believe that the deed conveys exclusive title. Moreover, even setting aside my disagree-

affirmative duty on cotenants out of possession to make a "hostile move in support of their own title . . . ." *Lucas* v. *Crofoot*, supra, 626.

Other jurisdictions have expressly concluded that a conventional quitclaim deed can provide evidence that a grantee thereunder intended to hold adversely to any cotenants, when the circumstances indicate that the parties understood the deed to convey full title to the property. See, e.g., *Gigger* v. *White*, 277 Ga. 68, 71 and n.3, 586 S.E.2d 242 (2003) (quitclaim deed to cotenant in ignorance sufficient to establish color of title where grantee believed grantor to be sole owner); *Bel* v. *Manuel*, 234 La. 135, 142, 99 So. 2d 58 (1958) (quitclaim deed conveying only "the vendor's right, title and interest in land . . . will be considered adequate to support a prescriptive title . . . where there is nothing contained in the deed itself which would create doubt in the mind of the vendee that the vendor's interest did not extend to the whole property"); *Scramlin* v. *Warner*, 69 Wn. 2d 6, 10, 416 P.2d 699 (1966) ("The deed in question described all the property [the grantor] thought he owned. The fact that it was in quitclaim form demonstrates only that he gave no warranties, not that anything less than all the property was intended to pass. [We are aware of] no authority for the proposition that color of title cannot be gained when a statutory quitclam deed is used . . . ."); see also annot., supra, 82 A.L.R.2d 177, § 42 ("[a]n entry made under a conveyance purporting to vest in the taker, *or seemingly completing in him*, exclusive title to the premises, ordinarily characterizes his possession as in fact and in law adverse to his cotenants" [emphasis added]); annot., supra, 82 A.L.R.2d 182, § 42 ("[where] the circumstances show that the possessor's cotenants had knowledge or notice that the possession was not taken as that of a cotenant

ment with the majority as to the scope of the rule established by *Lucas*, *Cady* and *Rogers*, it is clear that no Connecticut case has ever held that a quitclaim deed such as the one in the present case *cannot* provide color of title sufficient to ground a claim of adverse possession.

but rather in reliance on an instrument purporting to give the possessor exclusive title, the adverse character of the possession, both in fact and in law, becomes fully apparent").

Courts have also found that a party does not take possession of common property as cotenant, and therefore may establish ouster through sole possession, when he is initially ignorant of the existence of the cotenancy. Annot., supra, 82 A.L.R.2d 162, § 40. The rationale for this rule is that when a party is not aware that he is a cotenant, there is no reason to think that his possessory acts are performed for the benefit of any cotenants. And where his cotenants are aware that he does not perceive them as such, they, in turn, are on notice of the adversity of his possession. Moreover, "[r]equiring actual knowledge of disseisin would deprive the principle of prescription of much of its value in quieting controversy and giving sanction to long continued usages. . . . Long dormant claims to title could rise from the dust bin of history and many titles would become unsettled." (Citation omitted; internal quotation marks omitted.) *Allen* v. *Batchelder*, 17 Mass. App. 453, 457, 459 N.E.2d 129, review denied, 391 Mass. 1104, 462 N.E.2d 1374 (1984). Accordingly, a number of jurisdictions that have traditionally set a very high bar for establishing adverse possession against a cotenant make an exception where both parties are initially ignorant of the cotenancy.[16]

Although the majority suggests that Connecticut law does not permit adverse possession among cotenants

[16] See, e.g., *Pebia* v. *Hamakua Mill Co.*, 30 Haw. 100, 109 (1927) ("[t]his court has always held that evidence of ouster or the adverse character of a claim must be much clearer as between co-tenants than as between strangers, but it has never gone so far as to hold that . . . the more stringent rule applicable to cases of co-tenancy applies where there is no recognition or knowledge of the existence of a co-tenancy"); *Chambers* v. *Wilcox*, 1905 Ohio Misc. LEXIS 48, *10–13 (Ohio Common Pleas January 16, 1905) (quieting title in plaintiff cotenant in ignorance, notwithstanding usual Ohio rule that cotenants may only adversely possess against other cotenants through overt,

in ignorance,[17] this court repeatedly has upheld findings of adverse possession under those circumstances. See,

unmistakable acts of ouster, because where all parties had proceeded for years on assumption that plaintiff was exclusive owner, there had been no need or cause for him to notify defendants of his intention to continue in that capacity).

[17] The majority contends that *Newell* v. *Woodruff*, 30 Conn. 492 (1862), a case in which adverse possession was not even at issue, holds that ouster is not possible between cotenants in ignorance. I disagree. *Newell* was an action seeking damages for ejectment, predicated solely on vague letters the plaintiff's attorney had sent to the defendant, suggesting without proof or specificity that the plaintiff was " 'perhaps' " entitled to possession of a part of the property. Id., 499. In affirming the trial court's granting of nonsuit, we explained that it would be unjust to subject the defendant "to the cost and damage demanded in an action of disseizin" without first: (1) detailing the basis of the plaintiff's claims; (2) formally requesting possession of the land; and (3) affording the defendant an adequate opportunity to grant or deny access. Id., 498. Accordingly, although the case does suggest that knowledge of one's cotenant status is necessary for dispossession to occur, it does so in the specific context of an ejectment action, where it would be unjust to penalize the *party in possession* for disseizing a cotenant whom she never knew existed and had never actively barred from possession. In other words, the court, quite reasonably, imposed a mens rea requirement before a cotenant may be found liable for *damages* resulting from an alleged ouster. See *Giannattasio* v. *Silano*, 115 Conn. 299, 302, 161 A. 336 (1932) (*Newell* stands for proposition that "[w]here a person is occupying premises as his own, in the belief that he has an exclusive title, and in ignorance of the rights of another person as tenant in common, it is unreasonable that he should be subjected to the cost and damage demanded in an action of disseizin, until the demandant has apprised him with reasonable precision of the nature of his claim" [internal quotation marks omitted]).

There is no indication in *Newell* that the court would have applied the same standard where a party in long possession seeks merely to quiet title in herself. The majority asserts that the close relationship between actions for ejectment and actions for adverse possession—both revolve around a claim of disseisin—means that language from the *Newell* opinion, and its syllabus, necessarily applies to adverse possession as well as to ejectment. Although it is true that ejectment and adverse possession are two sides of the same coin, the difference between heads and tails is not always insignificant. In the case of *Newell*, the cited language only makes sense in the unique context of an ejectment action, where a party is subject to damages. It would be perverse, to say the least, if, as the majority suggests, the law were to require a wrongful intent before *rewarding* a party with legal title to land.

Even if there were a legal requirement that cotenants be aware of the cotenancy before ouster can occur, which I believe there is not, it would still be true that a cotenant may be ousted once the cotenancy is discovered, and that in such cases ouster may be more readily established than when

e.g., *Ruick* v. *Twarkins*, supra, 171 Conn. 154–55, 160–61 (affirming trial court's finding that mother adversely possessed land against her children beginning in 1938, notwithstanding that she was unaware of their claims until 1972); *Standard Co.* v. *Young*, supra, 90 Conn. 136–37 (finding adverse possession where widow, as cotenant with her children via dower, purported to sell entire property to unaware third party); *Harrison* v. *International Silver Co.*, supra, 78 Conn. 419 (finding ouster where defendant and its predecessors acquired and held contested land under color of title for twenty-six years unaware of cotenancy with plaintiff); see also *Hagopian* v. *Saad*, supra, 124 Conn. 259 ("[a] wrongful intent to disseize the true owner is not a necessary element of adverse possession").[18]

the parties knew of the cotenancy from the outset. In a cotenancy that arises with the knowledge of all parties, the status quo involves an expectation that one cotenant possesses with the consent and for the benefit of all, so that a cotenant seeking to possess exclusively bears the burden of notifying his cotenants thereof. By contrast, when the status quo has been such that both parties believe the cotenant in possession to be the exclusive owner, and when that party's relationship to the land and the other cotenants does not change upon their discovery of the cotenancy, the most reasonable assumption under the circumstances may be that the possession remains adverse. See *Ricard* v. *Williams*, supra, 20 U.S. 116; *Lucas* v. *Crofoot*, supra, 95 Conn. 626; *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 191. In that case, the burden shifts to the ousted cotenants actively to press their possessory rights, consistent with the holding in *Newell* that the allegedly ousted cotenant bore the burden of clearly asserting his right to the land. *Newell* v. *Woodruff*, supra, 30 Conn. 498.

[18] The majority, having alleged that Connecticut law unequivocally bars adverse possession between cotenants in ignorance, relies on a single Superior Court opinion; see *Diamond* v. *Boynton*, 38 Conn. Sup. 616, 618, 458 A.2d 18 (1983); to dismiss all four cases in which this court found, or permitted a trial court to find, adverse possession under precisely those circumstances. I fail to understand the majority's reasoning here. The argument appears to be that the purported *Newell* rule does not apply under the "special circumstances" where the cotenant in possession holds under color of title. But that theory is fundamentally inconsistent with the majority's reading of *Newell*. If, as the majority contends, *Newell* stands for the proposition that ouster of a cotenant is possible only when the party in possession knowingly and wrongly intends to dispossess his cotenants, then why should that rule not apply when his is the only name on the land records? This flies in the face of the very language from *Newell* on which the majority relies: "[T]here can be no . . . adverse holding, where one is

in the enjoyment of that which he honestly supposes is his . . . ." *Newell* v. *Woodruff*, 30 Conn. 492, 498 (1862).

I would further emphasize that in the cases in which this court has permitted a finding of adverse possession among cotenants in ignorance, the court's reference to the land records was merely by way of noting that the possessory cotenant held the property under color of title. That is precisely my claim in *this* case. Although it is true that in the present case the plaintiff's name was not the only name on the land records, there was undisputed testimony at trial that neither the plaintiff nor the defendant was aware of that. Because the law is clear that ouster requires only that the parties *believe* that the would-be adverse possessor is holding exclusively, that is a distinction without a difference.

The majority's further efforts to distinguish the four subsequent cases in which this court has implicitly rejected the purported *Newell* rule are unavailing. First, the majority contends that *Ruick* v. *Twarkins*, supra, 171 Conn. 158, was not in fact a case of cotenants in ignorance, because the plaintiff in that case knew that she had defrauded her husband of his share in the land. The majority ignores the fact that the case was not between the plaintiff and her late husband. Rather, the defendants were three of their four daughters, who, as in the present case, had unknowingly acquired their father's share through the law of intestate succession. Id., 151. The opinion makes quite clear that the plaintiff did believe that she was the sole owner of the property upon her husband's death, and that she was not aware of her daughters' claims until the statutory period for adverse possession had passed. Id., 154–55, 159.

Second, the majority contends that in the case of *Harrison* v. *International Silver Co.*, supra, 78 Conn. 417, the court did not reach any conclusion as to the defendant adverse possessor's knowledge of his ownership of the property when the ouster commenced. Although it is true that the court in *Harrison* never expressly stated that the defendant held the land in ignorance of the cotenancy, the facts of the case, as recited by the court, make it clear that the defendant could not have been aware of the cotenancy. The land in *Harrison* was conveyed in 1873 by the plaintiffs' guardian by a deed reciting that he was duly authorized to make such conveyance by an order of the Court of Probate. Id., 418. The plaintiffs themselves did not discover until 1886 that certain defects in the appointment of the guardian rendered the 1873 conveyance invalid, and they did not inform the defendant until sometime between 1898 and 1900. Id. On the defendant's side, the land had passed from the 1873 purchaser to the defendant through a series of conveyances, including a mortgage foreclosure. Id. Given that record, if there were a rule barring adverse possession among cotenants in ignorance, the court surely would have addressed the matter.

Third, in the case of *Standard Co.* v. *Young*, supra, 90 Conn. 133, the majority relies on the fact that this court did not decide whether there had been an ouster, but rather remanded the case for a jury trial. The majority misses the point here. The trial court in *Young* found that the plaintiff, a cotenant in ignorance, had acquired the disputed property by adverse possession. This court, on appeal, while assuming that adverse possession had been properly found, remanded the case because it had been improperly tried to the court rather than before a jury. Id., 138–39. If, however, the

Here, the record supports a finding that, commencing in 1980, the plaintiff took and held the lot under a deed that she believed, and publicly represented, afforded her exclusive title. It is undisputed that the plaintiff did not initially acquire and possess the lot as an avowed cotenant. Both parties were unaware that they had each inherited a share of the lot from their father, Constanty Percoski, believing instead that the plaintiff had purchased full title to the lot from her mother, Doris Percoski.[19]

At trial, the plaintiff made clear that this was the central basis for her claim of adverse possession. When asked "isn't your claim in this lawsuit that . . . the reason you acquired the title to the property from . . . the defendant is because you paid the taxes on the whole piece," the plaintiff replied: "It's because I bought it from my mother under the assumption and she was— and everyone else was under the assumption that she

majority was correct in its view that, as a matter of law, adverse possession is impossible as between cotenants in ignorance, the court in *Young* would have neither assumed that adverse possession was properly found nor remanded the matter for a jury trial, because the plaintiff could not ultimately have prevailed.

Finally, the majority declares the remaining case, *Hagopian* v. *Saad,* supra, 124 Conn. 256, to be an "outlier." This conclusion is problematic because *Hagopian,* a cotenant case decided more than seventy-five years after *Newell,* explicitly states that "[a] wrongful intent to disseize the true owner is not a necessary element of adverse possession." *Hagopian* v. *Saad,* supra, 259. Where an express statement of the law in a later case conflicts with what can at best be described as an implied legal principle contained in an earlier case, it seems odd to say that the later, more explicit case is the outlier. Adopting the majority's view of the law requires not only reading into *Newell* a legal rule that is inconsistent with the court's reasoning in that case, but also ignoring the law as we have subsequently stated and applied it over the past century.

[19] The majority emphasizes that the plaintiff and her husband appear to have planted trees in the early 1980s so as to wall off the lot from their *own* home. The record does not reveal their original intent in this regard, or whether, for instance, they initially may have planned to delineate the lot boundaries so as to facilitate its later sale to a third party. In any event, throughout the course of litigation between the parties, it has never been suggested that the plaintiff was aware of the cotenancy prior to 1987.

owned it totally." The plaintiff also explained, in response to multiple questions from her attorney regarding her purchase of the lot from her mother, that her February 27, 1980 mortgage to her mother, in the amount of the purchase price of $9000, represented the full market value of the lot at that time. The plaintiff further testified that her mother intended to convey all of the lot to her. The trial court, crediting the plaintiff's testimony, expressly found that "Doris Percoski, believing she held full title to [three lots] after [Constanty Percoski's] death, conveyed [two] lots . . . to [the defendant] and her husband . . . . [and] conveyed [the lot at issue in the present case] to [the plaintiff] and her husband . . . . At the time of these conveyances it appears that the [plaintiff and her siblings] were also of the belief that [Doris Percoski] was the sole owner of the real estate."[20]

Consistent with her view that she acquired all of the lot from her mother, the plaintiff testified that, after recording the deed in the land records, she insured the property, paid the full annual taxes due,[21] and leased out the property without seeking her siblings' consent. She further testified that both before and after 1987 she acted as the sole owner, emphasizing that "I . . . treated it as my own."[22] Accordingly, the trial court

---

[20] The plaintiff's complaint refers to the memorandum of decision from the prior litigation in which the trial court concluded that "the evidence supports a finding that all parties believed [Doris Percoski] was the owner" of Constanty Percoski's lands. *Larocque* v. *Percoski*, Superior Court, judicial district of Tolland at Rockville, Docket No. CV-97-0063927-S (February 18, 2003).

[21] The assessment records of the town of Somers identified only the plaintiff and her husband as the owners of the property.

[22] In the face of the plaintiff's clear trial testimony that her claim of adverse possession is based on the fact that all parties believed that she had acquired sole possession of the lot in 1980 and that she had acted as though she were the sole owner from that time forth, I am at a loss to understand the majority's continued insistence that there is "no evidence in the record that the plaintiff had the requisite intent [to exclude the defendant] in 1987," or that it is the plaintiff's position that the defendant was not on notice thereof until 1997.

reasonably found that Doris Percoski conveyed the lot to the plaintiff in 1980, at which time both parties to the present action operated under the assumption that the plaintiff had acquired full title.

There is, moreover, no indication that the plaintiff abandoned her exclusive claim to the property in 1987 when she discovered "the cloud on [her] title . . . ." To the contrary, she continued to pay all of the taxes and to retain the profits from the lot, without seeking any permission or accounting from her siblings.[23]

The record is also devoid of evidence that the defendant ever took any affirmative steps to exercise her rights in the land. Once the parties discovered the cloud on the title, in the absence of any change in course by the plaintiff the onus lay on the defendant to indicate that she no longer intended to abide by the status quo. See footnote 17 of this dissenting opinion. The defendant never volunteered to shoulder her share of the tax burden when she became aware of her interest in the land in 1987, nor in the twenty subsequent years during

[23] The plaintiff's claim to hold the lot under color of title is not negated by the fact that, upon discovering the cloud on the title in 1987, she sought, with varying success, to obtain her siblings' interests therein. Because the law encourages the peaceable and expeditious resolution of property disputes, efforts to settle such disputes need not undermine a claim of exclusive ownership. Annot., supra, 82 A.L.R.2d §§ 81 and 84; *Ruick* v. *Twarkins*, supra, 171 Conn. 154 (affirming trial court's finding of adverse possession where plaintiff had asked defendants to sign papers relating to their interests in land); *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 186 (finding adverse possession where plaintiff subsequently acquired quitclaim deeds from three of five cotenants). In its articulation in the present case, the trial court expressly found that the plaintiff sought and—in some cases—obtained her siblings' interests in the lot "in an effort to reach a settlement of the property issues between the parties" and not as "an admission of ownership . . . ." This was a question of fact, on which we must defer to the trier. Annot., supra, 82 A.L.R.2d § 84. Moreover, the defendant's unwillingness to grant her share of the lot to the plaintiff supports, rather than undermines, the plaintiff's claim, because it indicates the hostility of the plaintiff's possession. See *Bryan* v. *Atwater*, supra, 189 ("[i]f [the possession] be without the [owner's] consent, and against his will, it is adverse").

which the plaintiff held sole possession. I would therefore defer to the trial court's factual finding that the plaintiff's purchase and use of the land afforded sufficient notice of her claim to exclusive possession, because, as the court explained, "[t]here was no occasion for the plaintiff to take any action to exclude the defendant from the property since the defendant herself gave no indication that she claimed an ownership interest, nor did she believe she had any interest in the property until 1987 . . . ."

A second situation in which the trier of fact may infer ouster occurs where one cotenant enjoys an extended period of sole, uninterrupted possession during which the cotenants out of possession fail to seek any accounting of or access to the land and its profits. The majority recognizes that this court embraced this principle in *Camp* v. *Camp*, 5 Conn. 291, 302 (1824), wherein we adopted *Doe ex dem. Fishar* v. *Prosser*, 98 Eng. Rep. 1052 (K.B. 1774), as Connecticut law.[24] Where the majority and I part ways is that the majority would apply the presumed ouster principle developed in *Prosser* and *Camp* only when the tenant in possession "occupies the property for a specific and obvious use, such as a parsonage," for significantly longer than the statutory period.

Considering first the use of the property, in *Prosser*, a case the majority correctly identifies as the leading one on the subject,[25] the property at issue was characterized only as "lands," and there is no indication that the possession and occupation were for any specific or obvious use. *Doe ex dem. Fishar* v. *Prosser*, supra, 98 Eng. Rep. 1052. Moreover, in *Prosser*, Justice Aston

[24] In fact, we adopted *Prosser* in the earlier case of *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 188.

[25] See annot., supra, 82 A.L.R.2d 134 ("[t]he initial, and leading, decision, recognizing, defining, and applying the principle of presumed or inferred ouster, is [*Prosser*]").

emphasized that the primary evidence supporting a presumption of ouster was simply that the defendant had enjoyed "uninterrupted receipt of the rents and profits without account . . . ." Id., 1053. Courts and commentators, in defining the principle for which *Prosser* stands, likewise have declined to impose any requirement that land be used in any particular manner. See, e.g., *Rickard* v. *Rickard*, 30 Mass. (13 Pick.) 251, 253 (1832) ("It is also now well settled, that a long exclusive and uninterrupted possession by one, without any possession, or claim for profits by the other, is evidence from which a jury may and ought to infer an actual ouster. *Doe ex dem. Fishar* v. *Prosser*, [supra, 1053]."); annot., supra, 82 A.L.R.2d 132, § 37 ("[l]ong continued, peaceable and undisturbed, and unshared and unquestioned possession and exclusive income taking, without acknowledgment of the cotenancy, [grounds] a presumption or inference of ouster, or of grant of adverse possession"); 3 Am. Jur. 2d, supra, § 207 (similar).[26]

Considering next the length of possession necessary to implicate *Prosser*, this court has implied that there is no minimum time frame beyond the statutory requirement for adverse possession. In *Bryan* v. *Atwater*,

---

[26] Although I agree that the fact that the property in *Camp* was actively used as a parsonage strengthened the defendants' claim of ouster, nothing in that case indicates that such a specific use of the land is a precondition for applying the *Prosser* rule. Similarly, in *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 188, although the property in question was in fact developed land, this court recited the *Prosser* rule in quite general terms, without any reference to the use of the property: "[I]f one tenant in common, has been in possession a great number of years, without any accounting to his fellow commoners, this is proper evidence, from which the jury may infer an adverse possession." Nothing in *Bryan* suggests that, in adopting *Prosser* as Connecticut law, this court imposed an additional requirement that the land be used for any particular purpose. Rather, the court suggested that the *Prosser* rule is simply an example of the general principle, equally applicable to landlord-tenant law, that "[i]f [possession] unaccompanied with any other acts . . . has been of long standing, without accounting for the rents and profits, it may be evidence to the jury, of an adverse possession." Id.

supra, 5 Day (Conn.) 182, the defendant's predecessors held the contested land for seventeen years prior to the plaintiff heirs' initiation of suit, during fifteen of which the parties held the land as tenants in common.[27] Relying in part on *Prosser*, this court rejected the trial court's conclusion that, as a matter of law, the defendant could not have acquired the property through adverse possession during that period. Id., 187–88.

Other jurisdictions have likewise concluded that while uninterrupted use of common land for more than thirty-five years is *sufficient* to establish adverse possession by a cotenant, that duration is not *necessary* for *Prosser* to apply. Rather, the trier of fact may reasonably presume that a cotenant who sleeps on her rights for more than two decades has abandoned her claim to the land. See annot., supra, 82 A.L.R.2d 132, § 37 ("[n]umerous cases hold, recognize, or affirm that if a cotenant enjoys the sole, and the undisturbed and peaceable, occupancy for a long period of time, such as for [twenty] years or longer . . . the facts and circumstances will . . . warrant a presumption or inference that an actual ouster or disseisin of the possessor's cotenants occurred, and that an adverse possession was accordingly established"); cf. *Myers* v. *Bartholomew*, 91 N.Y.2d 630, 632, 697 N.E.2d 160, 674 N.Y.S.2d 259 (1998) (under New York statute, common-law presumption against adverse possession by cotenant expires after twenty years of sole possession).[28]

---

[27] In *Bryan*, the plaintiffs and their siblings inherited the land in question from their father on his death. Several years after entering the land pursuant to a bond, the defendant's predecessors obtained by quitclaim deed the interests of the father's widow and two of the four siblings, but the plaintiffs refused to relinquish their interests. *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 182–83 (recitation of facts).

[28] Indeed, in *Prosser* itself several justices implied that a briefer occupancy could have supported the result. See *Doe ex dem. Fishar* v. *Prosser*, supra, 98 Eng. Rep. 1053–54 (Ashhurst, J.) (implying that jury might have found ouster based on twenty-six years of possession); id., 1053 (Mansfield, Lord) (relating case to hypothetical in which tenant pur autre vie holds over for twenty years).

In the present case, the trial court reasonably could have found that the standards for presumptive ouster outlined in *Prosser* and its progeny were satisfied. The plaintiff maintained sole physical possession of the land from 1980 until 2007. During that time, there is no indication that the defendant ever entered or sought to enter onto the lot, nor that either party offered or requested an accounting. Those twenty-seven years of exclusive, peaceful possession represented nearly twice the statutory minimum for establishing adverse possession, and well over the twenty year period that most jurisdictions consider sufficient to demonstrate presumptive ouster. Moreover, the trial court found "no evidence that the [plaintiff's] use of [the] lot . . . was done with the defendant's permission." In addition, notice that a cotentant's use of joint property is hostile, and the expectation that the cotenant out of possession will seek an accounting, are heightened where the latter resides in the same neighborhood and can be deemed to be aware of the former's use of the land. Annot., supra, 82 A.L.R.2d 257, § 60. Here, where the parties were essentially next-door neighbors, the defendant cannot claim to have been unaware of the plaintiff's use of the property, and her protracted failure to seek either access or an accounting strongly suggests an acquiescence in the plaintiff's exclusive possession. I would therefore affirm the trial court's determination that "reliable evidence sufficiently repudiated the defendant's right of ownership."

Finally, it is well established under Connecticut law that the trier of fact may find ouster, in the absence of any affirmative act of notification, under any other circumstances indicating by clear and convincing evidence that the cotenant in possession intended to hold the property exclusively and the cotenants out of possession had actual or constructive notice thereof. See *Miller* v. *State*, 121 Conn. 43, 49, 183 A. 17 (1936); *Lucas*

v. *Crofoot*, supra, 95 Conn. 623–24; *Goodwin* v. *Bragaw*, supra, 87 Conn. 39–40; *Bryan* v. *Atwater*, supra, 5 Day (Conn.) 192; see also 3 Am. Jur. 2d, supra, § 206; see generally annot., supra, 82 A.L.R.2d §§ 52 through 76. For example, in *Ricard* v. *Williams*, supra, 20 U.S. 120–21, the United States Supreme Court, applying Connecticut common law,[29] reversed the Circuit Court and found that an heir had adversely possessed against his sibling cotenants when he took and held the land under a claim of exclusive title. The court explained that even in the absence of any paper title, the jury could have found adverse possession "if they were satisfied, that [the possessing heir's] possession was adverse to that of the other heirs, and under a claim of title distinct from, or paramount to that of his father . . . ." Id., 122. The rationale for this rule is, again, that the presumption *against* finding ouster of a cotenant rests on the principle that cotenants share equal rights to their common property, so that use by one is assumed to be with the consent and for the benefit of all. But where it becomes clear to the cotenants out of possession—and to the trier of fact—that a party has held the land not in her capacity as cotenant, but under an exclusive claim of right, then the presumption against adversity is no longer applicable, and the conventional rules of adverse possession should govern the case.

Here, I would affirm the trial court's finding that, "[u]nder the unique facts of this case, [one can readily infer] that the plaintiff intended to exclusively use the property and [the] defendant is being disingenuous to claim otherwise." The trial court based this finding of ouster on several subsidiary factual findings, including: (1) the bitter, unsisterly relationship between the parties, who had not spoken to each other since the early

---

[29] In *Hewitt* v. *Beattie*, 106 Conn. 602, 610, 138 A. 795 (1927), we cited *Ricard* among a list of "our decisions . . . ." See also *Hewitt* v. *Sanborn*, 103 Conn. 352, 372, 130 A. 472 (1925) (relying on *Ricard* for Connecticut law).

1980s; and (2) their history of litigation, including the defendant's successful action to possess adversely two lots from the plaintiff "under very similar facts." The majority does not dispute that the record supports these subsidiary findings. Rather, the majority contends that these findings do not support the trial court's conclusion that the defendant was on constructive notice, after 1987, of the plaintiff's intent to oust her. I disagree.

In the prior action between the parties, the defendant's alleged use of the two lots at issue in that case closely paralleled the plaintiff's use of the lot in the present case: she acquired and recorded title to the property, was listed as the sole taxpayer of record, paid taxes on the property, performed lawn mowing and related general maintenance, and leased the lots annually to the county fair. See *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 496, 234 A.2d 825 (1967) (attorney's admissions in legal brief admissible against client); 2 B. Holden & J. Daly, Connecticut Evidence (1988) §§ 103a and 104d, pp. 1020 and 1038 (same).

On the basis of those facts, the defendant alleged that she and her husband had "used and enjoyed the [land] for more than fifteen years . . . and such use and possession has been at all times open, notorious, adverse, exclusive, continuous, uninterrupted and [they] have thereby acquired and . . . now have sole and exclusive title to the premises . . . ." In her post-trial brief in that prior action, the defendant further averred that her exclusive use of the lots at issue in that case was demonstrated by the fact that the plaintiff and the other sibling cotenants "never did anything to interfere with their use . . . never used the property . . . [and] never contributed to the payment of any taxes . . . ." In other words, the defendant contended in the prior action that, based solely on the defendant's use of the land and the plaintiff's lack thereof, the plaintiff was placed on notice that she was not welcome on

the land, and that the defendant had no intention of sharing the land with her.[30]

Inexplicably, in the present action, between the same two sisters who have not been on speaking terms for more than twenty-five years, where the plaintiff's use of the lot in the present case has been a mirror image of the defendant's use of the lots in the prior case, the defendant now suggests that under those same circumstances *she* had no way of knowing that *she* was unwelcome on the plaintiff's lot, or that the plaintiff viewed it as exclusively her own. The trial court, having heard the testimony of both parties, rejected this sudden, self-serving change of perspective, concluding that the defendant "was under no illusion" that the plaintiff considered her to be a cotenant on the land, and that she was "being disingenuous to claim otherwise."[31] The trial court was in the best position to make this credibility assessment, and I would defer to the court's factual finding that the plaintiff intended to hold the lot as her own, and that the defendant was on notice thereof. Accordingly, I respectfully dissent.

---

[30] Significantly, even though the prior litigation took place in 1997, the defendant's allegations in that prior case, on which the plaintiff and the trial court relied in the present case, hearkened back to 1980. In other words, if the defendant claimed in 1997 that her holding had always been openly hostile to the plaintiff, then she cannot contend that she had been unaware that the plaintiff's mirror-image holding was likewise hostile to her during that same time period.

[31] In closing argument, the plaintiff's counsel specifically referenced the history of litigation between the parties as evidence that the defendant must have been on notice of the plaintiff's hostile intent, and further noted that the defendant must have been aware of the plaintiff's claims based on the defendant's own position in the prior action. It is therefore reasonable to infer that the court had this theory of the case in mind in finding that ouster had occurred.